WILLIAM B. CLOSE *et al.*

*v.*

D. H. BROWNE, Admr.

*Opinion filed October 23, 1907—Petition stricken Dec. 4, 1907.*

1. CONTRACTS—*court will read contract in light of surrounding circumstances.* In construing a written contract the court will read the instrument in the light of the circumstances surrounding the parties at the time it was made, so that the court may understand the language used in the sense intended by the parties.

2. SAME—*when word "sale" will be regarded as used in its ordinary sense.* The word "sale," used in a contract of employment to sell land, will be construed as used in its ordinary meaning of a transfer of property for money, where it appears that the commissions of the agent were graded in three classes, viz., where he found the purchaser himself and made the sale; where he assisted in making sale to parties sent to him by his employer or the latter's agents; and where the employer sought the agent's advice in accepting applications of prospective purchasers.

3. PRINCIPAL AND AGENT—*limit of the rule that broker may recover though principal sells on different terms.* The rule permitting a recovery of commissions by a real estate broker in case the principal sells to a purchaser produced by the broker upon terms different from those of the broker's contract, is limited to mere departures from the contract, such as reduction of price, extension of time of payment, etc., and does not extend to a transaction wholly different from the one contemplated by the brokerage contract.

4. SAME—*a broker is not without remedy if he renders services not contemplated by contract.* A disposition of land wholly different from that contemplated by the contract between the owner and the real estate broker employed to sell the land does not entitle the

broker to recover upon the contract, but if the owner receives the benefit of the broker's services, rendered· at the instance of such owner, he is liable upon a *quantum meruit.*

5. SAME—*what is not a "sale" such as entitles agent to commission.* A transfer of a large tract of land, made to carry into effect a plan to organize a corporation and consolidate the interests of the owners of the land with the interests of an irrigation company, so as to enhance the value of the land by securing irrigation, is not a "sale" in the ordinary sense of that term, such as entitles a field agent of the land owners to commissions under his contract which contemplates ordinary sales, even though he rendered valuable services, at the instance of his employers, in effecting the consolidation, but he is entitled to recover upon a *quantum meruit.*

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

This was an action of assumpsit brought in the superior court of Cook county by Thomas Hinsley, now deceased, against the appellants, co-partners doing business under the name of Close Bros. & Co., of Chicago, to recover for services claimed to have been rendered by Hinsley, under a contract, in effecting the sale of 96,099 acres of land in the western part of the State of Kansas. Appellants were the agents of the owners of these lands, who lived in England. Under date of April 2, 1887, a contract was entered into between Hinsley and appellants whereby Hinsley was employed by appellants to act as their agent at Hartland, Kansas, for showing and selling lands along the line of the Atchison, Topeka and Santa Fe railway in south-western Kansas, to, reside on or near said lands, to negotiate sales and to forward to appellants applications of prospective purchasers, but without authority to execute contracts or to make conveyances. On December 10, 1888, another agreement, which superseded that of April 2, 1887, was made between appellants and Hinsley. It provided that Hinsley

should act for Close Bros. & Co. as their agent for showing and selling the Kansas lands; that he should negotiate sales, forward applications and receive binding money, but should not execute contracts or conveyances and should not show or sell lands, nor forward applications for the same, so as to cut or subdivide the sections disadvantageously. Hinsley agreed to use all reasonable diligence in finding purchasers and in making sales, and to act for the best interests of Close Bros. & Co. in all matters confided to him during his agency. As compensation for such services Close Bros. & Co. agreed to pay Hinsley commissions, as follows: First, on sales made to purchasers found by him and effected by, through or under his personal efforts, without assistance from other parties or from Close Bros. & Co., twenty-five cents an acre; second, on sales of lands sold by Close Bros. & Co. or by their other agents, through the assistance of Hinsley, ten cents an acre; third, on all sales made by Close Bros. & Co. or their agents resident along the line of the railway in south-western Kansas, without the assistance of the second party but under his advice, five cents an acre. The agreement went into effect January 1, 1889, and could be terminated by either party on giving one month's notice in writing. Hinsley was not to be entitled to any commissions on sales consummated after the expiration of one month from the giving of such notice.

The evidence shows that the lands were arid and that Hinsley soon discovered that they could not well be sold unless some means of irrigation was provided. The Amity Land and Irrigation Company, a Colorado corporation, owned certain lands and certain water rights in Colorado, including a ditch some seventy-six miles long, which extended from a point on the Arkansas river, in Colorado, to within about six miles of the Kansas State line. Hinsley learning of this ditch, and having been directed by appellants to be on the watch for any irrigation ditches that could be extended to the Kansas lands, during the spring of 1894

went to Lamar, Colorado, and there met William J. Halleck, president of the Amity Land and Irrigation Company. Halleck testifies that at this meeting he and Hinsley had some talk about the Kansas lands; that he (Halleck) endeavored to show Hinsley that the canal would be valuable to the Kansas lands if it was extended to them, and that Hinsley was mildly interested in the matter and said he would write to appellants about it; that he (Halleck) was not then acquainted with appellants and had not had any previous communication with them. Halleck soon afterwards returned to New York, and, after some correspondence with Hinsley, brought the matter to the attention of the president of the Western National Bank of New York, that bank being the beneficial owner of the canal. In June, 1894, Halleck went to Chicago and met Samuel H. Graves, one of the appellants, and opened negotiations with him, which Halleck says brought about a consolidation of the interests of the irrigation company and appellants, such consolidation being the transaction evidenced by the contract between that company, the owners of the Kansas lands and the appellants, of date February 18, 1895, hereinafter referred to.

According to Hinsley's testimony, he went to Lamar and met Halleck, showed him a map of the Kansas lands, described their location and asked him if the canal could be extended to those lands. Halleck wanted to sell the ditch, but Hinsley told him it was his (Hinsley's) business to sell the lands. Hinsley asked Halleck whether he knew appellants, and Halleck replied that he did not. He then gave Halleck a map of the Kansas lands, with appellants' address, and Halleck said he would call and see appellants on his way to New York. Hinsley reported this meeting with Halleck to appellants by mail. Thereafter Hinsley, at the request of appellants, made frequent examinations of the irrigating ditch throughout its course, and obtained information concerning the capacity of the ditch, details concern-

ing its construction, the supply of water furnished at its source, the probable benefit to the Kansas lands if extended to them, and various other facts tending to show the advantages which would be derived from the extension of this ditch to the Kansas lands, all of which he reported to appellants in numerous letters sent by him at various times during the summer and autumn of 1894.

The negotiations between the Amity Land and Irrigation Company and appellants culminated in the execution of a contract on February 18, 1895, the substance of which is as follows: After reciting that the Amity Land and Irrigation Company is the owner of certain lands, water rights and irrigation ditch in the State of Colorado, that William Austin, Edward Ford North and Robert Edward Bateman are the owners of certain unencumbered lands in Hamilton, Gray, Kearny and Finney counties, Kansas, aggregating 96,419 acres, for which Close Bros. & Co. are agents and managers, and that it is the mutual desire of the parties that the Amity company should extend its irrigation ditch into the State of Kansas and supply said lands with water for irrigating purposes, the contract provides: (1) That Austin, North and Bateman shall deed, subject to trust deed securing the three series of bonds, aggregating $1,160,000, thereinafter provided for, to the Amity Land and Irrigation Company, (referred to as the Amity company,) or its successors or assigns, the Kansas lands, and in payment therefor shall receive from the Amity company $600,000 in bonds and forty-nine per cent of the stock of the Amity company, its successors or assigns; (2) the Amity company agrees to enlarge its ditch in Colorado and extend it to the Kansas lands; (3) the Amity company shall issue bonds amounting to $1,160,000,—$200,000 to be used for the enlargement and extension of the Amity canal and to constitute a first lien, $360,000 of the bonds to be used to take up outstanding bonds against the Colorado property of the Amity company and to constitute a second lien, and

$600,000 of the bonds, to be known as purchase money bonds, to be delivered to Austin, North and Bateman in payment for their Kansas lands and to be a third lien,—all of said bonds to be secured by trust deed upon all the property, lands, water rights and franchises of said Amity company, its successors and assigns, including the said Kansas lands; (4) provision for the application of the income to the maintenance of the canal and payment of interest and bonded indebtedness; (5) Close Bros. & Co. to take charge of the lands and endeavor to sell them.

The parties to this contract were, first, the Amity Land and Irrigation Company; second, Austin, North and Bateman, the owners of the Kansas lands; and third, Close Bros. & Co., the agents for the sale of the Kansas lands.

For the purpose of carrying out the provisions of this contract the parties thereto organized the Amity Land Company, a corporation, under the laws of Kansas. Austin, North and Bateman, by deeds dated May 3, 1895, conveyed the Kansas lands to the Amity Land Company and the Colorado corporation conveyed the Colorado lands to the Kansas corporation. Forty-nine per cent of the capital stock of the new corporation was issued to Leonard H. Hole as trustee for Austin, North and Bateman, and fifty-one per cent to Hole as trustee for William N. Coler, Jr., representing the owners of the stock of said Amity Land and Irrigation Company. The bonds were issued and delivered as provided by the contract. Thereafter, on May 22, 1895, a new contract was made between appellants and Hinsley, whereby Hinsley from that time received a salary instead of commissions. During the month of July, 1895, acting under directions from appellants, he removed to Holly, Colorado, and thereafter resided there in charge of appellants' branch office, and acted as field agent for the Colorado lands owned by the Amity Land Company, until October 10, 1896, when he quit their service. According to his testimony he did not know that the Kansas lands had been deeded to the Am-

ity Land Company until December, 1896, and did not, prior to that time, know the terms of the contract of February 18, 1895. On January 13, 1897, he for the first time demanded commissions under his contract of December- 10, 1888, and payment being refused, brought this suit.

The declaration under which the case was tried consisted of counts declaring upon the contract and the common counts, including a *quantum meruit* count. On the first trial the jury returned a verdict for $31,632.58 in favor of Hinsley. The superior court required Hinsley to remit $18,-967.54 of this amount and rendered judgment against the appellants for $12,665.04. Upon appeal to the Appellate Court for the First District the judgment of the superior court was reversed and the cause remanded, for the reason, as stated in the opinion of the Appellate Court; that the verdict of the jury was a finding that appellants were liable under the first clause of the contract of December 10, 1888, but was not a finding that they were liable under either the second or third clause; that the verdict was against the overwhelming preponderance of the evidence, so far as the right to recover under the first clause of the contract was concerned, and that the superior court should have set aside the verdict and granted a new trial instead of requiring a *remittitur* and rendering a judgment not based on the verdict of the jury, but based solely on the finding of the court that appellants were liable under the second clause of their contract. *Close* v. *Hinsley,* 104 Ill. App. 65.

After the remanding order of the Appellate Court had been filed in the superior court Hinsley died, and his death being suggested to the court, D. H. Browne, as administrator of his estate, was substituted as plaintiff. The cause was re-docketed in the superior court and was again tried before a jury. Upon the second trial appellee expressly waived all claim to the commission of twenty-five cents per acre under the first clause of the contract, which related to sales made by Hinsley without assistance from the appellants or their

other agents, and the case was tried under the counts of the declaration based on the second and third clauses of the contract and the common counts. The trial resulted in a verdict against appellants for $14,454.90. Appellants filed a motion for a new trial, which was overruled. A motion in arrest of judgment was likewise overruled, and the superior court rendered judgment upon the verdict for $14,454.90 against the appellants. This judgment was affirmed by the Branch Appellate Court for the First District, and appellants bring the cause to this court.·

The grounds urged for reversal are, that the superior court erred in refusing appellants' motion, made at the close of all the evidence, to instruct the jury to return a verdict in their favor, and that the court erred in giving, refusing and modifying instructions.

F. C. ELLIOTT, for appellants.

MILTON BROWN, H. W. GLEASON, and ORPHEUS A. HARDING, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The superior court held, in passing upon the instructions offered by the respective parties, that the transaction between the owners of the Kansas lands, the Amity Land and Irrigation Company and the appellants, set forth by the contract of February 18, 1895, constituted a sale of those lands, and so advised the jury by instructions, and submitted to the jury the question whether such sale was made through the assistance of Hinsley or under his advice. The action of the court in holding that transaction to be a sale is the principal ground upon which a reversal is sought.

The contract between the appellants and Hinsley, upon which the appellee bases his right to recover, provided that Hinsley should act as the appellants' agent for showing and selling the Kansas lands; that he should be authorized to

negotiate sales and receive binding money,. and that as compensation for his services he should receive commissions upon "sales" of the lands, the rate of commission to depend upon the kind of services rendered by Hinsley in the particular sale.

The word "sale" is ordinarily understood to mean a transfer of property for money. (2 Blackstone's Com. 446; *Schermerhorn* v. *Talman,* 14 N. Y. 117; *Williamson* v. *Berry,* 8 How. 495; *Five per cent cases,* 110 U. S. 471.) In the case last cited the Supreme Court of the United States construed the language hereinafter quoted from an act of Congress of March 3, 1845, supplemental to the act by which the State of Iowa was admitted into the Union, the language so construed being as follows, to-wit: "Fifth, that five per cent of the net proceeds of sales of all public lands lying within the said State which have been or shall be sold by Congress from and after the admission of said State, after deducting all the expenses incident to the same, shall be appropriated for making public roads and canals within the said State." The question was whether the State was entitled to a percentage of the value of lands not sold for cash but disposed of by the United States in satisfaction of military land warrants. The court said: "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." If the purchase price is paid by the transfer of other property, the transaction is more properly denominated an exchange or trade. "It is a familiar rule, of constant application, that courts give effect to all written instruments according to the ordinary, popular meaning of the terms employed, when nothing appears to show they were used in a different sense and no unreasonable or absurd consequences will result from doing so." *Stettauer* v. *Hamlin,* 97 Ill. 312.

If this rule of construction is applied to the contract of December 10, 1888, it is apparent that Hinsley would not be entitled to commissions upon the transfer of the lands

to the Amity Land Company, that transfer not having been made for a money consideration. There is, however, another well known rule of construction applied to written instruments, viz., that in construing a written contract the court will endeavor to place itself in the position of the contracting parties, and read the instrument in the light of the circumstances surrounding them at the time it was made and of the objects which they then evidently had in view, so that the court may understand the language used in the sense intended by the parties using it. *Torrence* v. *Shedd,* 156 Ill. 194; *Street* v. *Chicago Wharfing Co.* 157 id. 605; *Matthews* v. *Kerfoot,* 167 id. 313; *Whalen* v. *Stephens,* 193 id. 121.

Applying the latter test to the contract of December 10, 1888, is there anything appearing, from the circumstances surrounding the parties at the time the contract was made, which shows an intention on their part to give to the word "sale" any other than its usual and ordinary meaning? An answer to this question involves a consideration of those circumstances as disclosed by the evidence.

It appears from the stipulation and undisputed evidence in the case that during the years 1887 and 1888, and prior thereto, appellants were engaged in the business of colonizing large tracts of western lands; that they had numerous agents in their employ, some of whom were known as field agents and others as traveling agents; that the traveling agents were employed to interest persons in Illinois and eastern States in the western lands controlled by appellants and to induce prospective purchasers to visit the lands; that the field agents resided on or in the immediate vicinity of the lands offered for sale, and to them the traveling agents brought or sent the prospective purchasers; that the field agents were required to be familiar with each quarter section of land within their respective territories and the boundaries thereof, and it was their duty to show the lands to the prospective purchasers and to aid the traveling agents in

making the sales. Hinsley had acted as field agent for appellants in Iowa prior to April 2, 1887. On the latter date he removed from Iowa to Hartland, Kansas, and entered the service of appellants as field agent for their lands in that vicinity under a contract, by the terms of which he was to receive a salary of $40 per month and five cents per acre on all lands sold by the appellants by or through his assistance. Hinsley worked under the latter contract until December 10, 1888, when the contract of that date was entered into.

Bearing in mind these facts, the reason for fixing three different rates of commission becomes apparent, and the sense in which the parties intended to use the word "sale" may be clearly understood. According to the previous experience of appellants and Hinsley, in carrying on the business of appellants there might, and probably would, arise three classes of cases in which Hinsley would be required to render some service in effecting sales of the lands: First, cases in which Hinsley should find the purchaser and make the sale; second, cases in which prospective purchasers should be brought or sent by appellants or their traveling agents to Hinsley and the latter should show the lands to the prospective purchasers, and thereby, or by other means, assist appellants or their traveling agents in inducing the purchasers to buy; third, cases in which other field agents in that locality should send to appellants the applications of prospective purchasers, and appellants, not knowing whether it would be to their interest to make the sales on the terms proposed, should seek the advice of Hinsley with reference thereto. Hence the parties provided by the contract of December 10, 1888, that on all sales falling within the first class Hinsley should receive twenty-five cents per acre, on all sales falling within the second class, ten cents per acre, and on all sales falling within the third class, five cents per acre.

Considering this contract in the light of the circumstances surrounding the parties at the time the contract was

made and of the objects which they then evidently had in view, it does not appear that they intended to use the word "sale" other than according to its ordinary acceptation.

When the contract of February 18, 1895, is considered in connection with the facts leading up to its execution, it becomes apparent that the parties thereto adopted the means set forth by that contract to effect a consolidation of their respective interests. It appears from the evidence that the Amity Canal and Reservoir Company was originally the owner of the canal and of other Colorado property subsequently owned by the Amity Land and Irrigation Company. The former company issued bonds secured by mortgage upon its property, and these bonds were taken by the Western National Bank of New York. The mortgage was foreclosed and the property of the company purchased by the bank at the foreclosure sale. The bank, early in 1894, through its officers and agents, organized the Amity Land and Irrigation Company and transferred the property to that company. The bank, however, remained the beneficial owner of the property. The appellants desired to sell the Kansas lands. Those lands could not well be sold without some means of irrigation. The canal of the Amity Land and Irrigation Company could be extended to the Kansas lands, but appellants did not desire to buy that canal and the bank did not wish to purchase the Kansas lands. Appellants, their principals, the owners of the Kansas lands, and the Amity Land and Irrigation Company, really acting for and under the direction of the bank, on February 18, 1895, entered into the contract of that date. No money was to pass. The bank had theretofore conveyed its canal and other Colorado property to the Amity Land and Irrigation Company. The value of that property was not as great as the value of the Kansas lands. The bank desired to retain the controlling interest in the corporation to which it had transferred the canal. It was therefore agreed that the owners of the Kansas lands should convey those lands to the Amity Land and

Irrigation Company and should receive therefor forty-nine per cent of the stock of that company or of its successor or assignee, and in order to equalize the interests of the respective parties in the assets of the corporation, it was also provided that the owners of the Kansas lands should receive, in addition to their stock, bonds of the corporation of the face value of $600,000, secured by mortgage on the property of the company.

While it is true that the owners of the Kansas lands parted with the title to those lands, yet they did so for the purpose of placing those lands in such condition that they might be sold for money. Hinsley was urging appellants to either purchase the canal or secure the controlling interest therein. The services for which he now seeks to recover were performed with that end in view. Obviously, if the appellants, for their principals, had followed the advice of Hinsley and purchased the canal, Hinsley would not have been entitled to any commission under his contract. By the plan adopted in the contract of February 18, 1895, the owners of the Kansas lands obtained the same benefit as they would had they purchased the canal, the only substantial difference being, that instead of receiving their money directly from purchasers of the lands, they would receive it, when the lands were sold, in the form of payments upon the bonds and dividends upon the stock issued to them by the Amity Land and Irrigation Company. We think that neither Hinsley nor the appellants had in contemplation any such transfer of property as that set forth in the last mentioned contract when they agreed that Hinsley should receive commissions upon all sales made by him alone, or made with his assistance, or made under his advice.

Appellee seeks to sustain the judgment in this case upon the authority of *Wilson* v. *Mason*, 158 Ill. 304, and other like cases, which hold that a real estate broker is entitled to his commissions if the principal sells to a purchaser produced by him, even though the sale be made upon terms

different from those stated in the brokerage contract. Such is the law applicable to cases where there is merely a departure from the terms of the contract, leaving the transaction substantially that provided for by the agreement, such as a reduction in the price asked or an extension of the time of payment of all or part of the consideration; but where the transaction is wholly different from the one contemplated by the parties when the contract was made there can be no recovery upon the contract. In this class of contracts it may be fairly presumed that the parties contemplate some slight modification in the terms of sale, provided the principal assent to such modification; but it cannot be presumed that the parties intend that the contract shall apply to a transaction wholly different from the one which they have in view when they enter into the contract. In the latter instance, however, the broker or agent is not without remedy. If the principal receives the benefit of the agent's services, rendered at the instance of the principal, he is liable upon a *quantum meruit*.

From what we have said it follows that the superior court erred in instructing the jury that the transaction evidenced by the contract of February 18, 1895, constituted a sale within the meaning of the contract of December 10, 1888, and in refusing instructions offered by the appellants which would have advised the jury that such transaction was not a sale within the meaning of the last mentioned contract. Inasmuch as there was no sale within the meaning of the contract between appellants and Hinsley, appellee was not entitled to recover under any of the clauses of that contract. The verdict, however, plainly shows, and appellee states, that the jury awarded commissions under the second clause of the contract at the rate of ten cents per acre on the land transferred to the Amity Land Company, together with interest thereon at the rate of five percentum per annum from February 18, 1895, to the date of the verdict, the court having instructed the jury that they might

230—16

allow such interest in case they found that appellee was entitled to recover under the contract of December 10, 1888. It is therefore apparent that the error committed by the court in advising the jury that the transaction set forth in the contract of February 18, 1895, was a sale, affected the verdict in the case and was prejudicial to appellants. The motion for a peremptory instruction at the close of all the evidence was, however, properly denied. The undisputed evidence shows that Hinsley rendered valuable services at appellants' request which led to the consolidation, and that appellants received the benefit of those services. The services so rendered by Hinsley which led to the consolidation are not covered by the contract of December 10, 1888, and were not performed under any express contract. Appellee is entitled to recover the reasonable value of those services. The declaration contained a *quantum meruit* count, and the evidence would have supported a verdict under that count. Under such circumstances it would have been error for the court to have directed a verdict for appellants.

It is unnecessary to consider any of the other alleged errors discussed by appellants in their brief. They are such as will not probably arise upon another trial of this case.

Because of the error of the court in instructing the jury that the transaction set forth by the contract of February 18, 1895, constituted a sale, and in refusing the instructions offered by appellants which would have advised the jury that such transaction was not a sale, the judgment of the superior court and the judgment of the Appellate Court will be reversed and the cause remanded to the superior court for further proceedings consistent with the views expressed in this opinion.          *Reversed and remanded.*