(No. 30424.—

SAUL PLAST *et al.*, Appellants, *vs.* METROPOLITAN TRUST COMPANY, Trustee, *et al.*, Appellees.

*Opinion filed September 24, 1948—Rehearing denied Nov. 11, 1948.*

GUNN, J., dissenting.

JOSEPH B. GILBERT, and PHILIP C. SHEEHAN, both of Chicago, for appellants.

LEVINSON, BECKER & PEEBLES, ARVEY, HODES & MANTYNBAND, and MORRIS BLANK, (DON M. PEEBLES, LOUIS M. MANTYNBAND, and IRWIN I. ZATZ, of counsel,) all of Chicago, for appellees.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

This is an appeal from a decree of the superior court of Cook County dismissing appellants' amended and sup-

plemental complaints for want of equity, and from an order allowing appellees damages upon the dissolution of a temporary injunction issued by the court incidental to the proceedings on the complaint for partition.

Saul Plast filed a complaint in chancery on behalf of himself and all other holders of certificates of beneficial interest in the Hotel Maryland Liquidation Trust for partition. Later, thirty others joined as intervenors as additional parties plaintiff. Also other parties intervened as defendants and counterclaimants. No questions are raised on any of the pleadings.

The cause was referred to a master in chancery to take testimony and report the same to the court with conclusions of law and fact. The report of the master was in favor of the appellees and against the appellants and it recommended that a decree be entered dismissing appellants' complaint for want of equity. The court approved the master's report and entered a decree dismissing the complaint as amended and supplemented. A freehold being involved, the appeal comes directly to this court.

The real estate involved in this trust is located at 900 N. Rush Street in Chicago and is improved with a seventeen-story building, the "Hotel Maryland," containing 296 furnished hotel rooms and apartment units, dining rooms, taverns and store. It was built in 1926 and was subject to a bond issue of $1,350,000. The bonds were defaulted and the trust deed securing them was foreclosed in 1931. On October 15, 1935, a trust agreement was entered into between a bondholders' committee and the Metropolitan Trust Company as trustee, creating the "Hotel Maryland Liquidation Trust," designated as Trust No. 1155, for the benefit of the bondholders. It provided for the liquidation of the assets and the distribution of the net proceeds thereof to the bondholders and, until such liquidation, for the operation and management of the property and distribution of the net income arising therefrom to the bondholders. The

property was conveyed to Metropolitan Trust Company as trustee and the latter thereupon took and assumed control of said property subject to the purposes, terms and conditions of said liquidation trust agreement for the benefit of the bondholders who were to turn in their bonds and accept in lieu thereof "Certificates of Interest" under said trust agreement. The certificates of interest provided that by the acceptance of the certificate, the holder thereof consented and agreed to be bound by all the terms, provisions and conditions contained in said trust agreement and that the holder had no claim or interest, legal or equitable, in any of the property covered by or referred to in said trust agreement, but only an interest in the net income, proceeds and avails thereof. The total number of units of beneficial interest in said trust outstanding when the suit was filed was 10,216⅞. The trust agreement was entered into by and between Barnet L. Rosset, Charles J. Young, Earl G. Krumrine, Louis J. Borinstein and A. D. Plamondon, acting as the committee for the protection of the bondholders, and Metropolitan Trust Company, trustee.

This case involves the construction of said trust agreement, the pertinent parts of which are contained in the following articles:

(In article I) "It is the intention and purpose hereof that the Holders of Certificates of Interest shall be trust beneficiaries only; that the Holders of Certificates of Interest, the Committee and its members, and the trustee and the Trust Managers, as herein constituted, shall have no other relationship hereunder; that there shall be no relation of or liabilities hereunder as partners, or any other relation or personal liability whatsoever, legal or equitable, among the Holders of Certificates of Interest, the Committee and its members, and the Trustee and the Trust Managers, or one with the others or any of them, or with other person or persons, corporation or corporations; and that the Holders of Certificates of Interest shall not have or acquire hereunder any title to said Trust Property, legal or equitable, nor any claim of interest therein, but shall have only a beneficial interest in the net income, proceeds and avails which may come into the hands of the Trustee through the operations of the property and through sales, leases, assign-

ments or other dispositions, conversions or uses of the Trust Property or any part or parts thereof."

(In article II) "And said Trustee shall have full power to grant options to purchase, to contract to sell and to sell the Trust Property and any parts thereof on any terms, including a sale of the Trust Property or any part or parts thereof to another Trust or to a corporation now or hereafter organized in exchange for stocks, bonds, Certificates of Beneficial Interest, or other securities of such corporation or Trust;"

(In article XI) "The Trust Managers shall have the power by written instrument signed by the Trust Managers and filed with the Trustee, to amend, add to, or alter this Trust Agreement from time to time in all respects except as to the date of termination of this Trust."

(In article XII) "This trust may be terminated at such time as the Trust Managers in their sole discretion may determine; it being the intention, however, that the Trust Property be sold and liquidated as soon after the institution of this Trust as conditions may permit and that the net proceeds thereof be distributed to the Holders of Certificates of Interest; but if not sooner terminated, then this trust in any event shall terminate within ten (10) years from and after the date hereof."

The trust agreement by its own terms expired October 15, 1945. In the face of the approaching termination of the trust, active discussions began between the trust managers with respect to the disposition of the property as early as the fall of 1944. In the early part of 1945 the plan was devised for transferring the property to a new corporation and the trust managers agreed to carry out the plan. The plan consisted in organizing a corporation known as 900 N. Rush Hotel Corporation, to take over the trust property in exchange for all the capital stock of the new corporation and first mortgage income bonds to be secured by the property taken over; to issue one share of stock, without par value, and one bond in the principal sum of $35 in exchange for each unit of beneficial interest in the liquidation trust. Two of the trust managers, Louis J. Borinstein and John A. Sargent became directors of the corporation. The third director was Raymond L. Redheffer who became identified with the corporation as

director and president. The three directors of the corporation entered into a voting trust agreement for the stock of the corporation on March 15, 1945, whereby the certificate holders in Trust No. 1155 were to deposit the shares of stock to which they would become entitled in exchange for voting trust certificates, in order that the stock might be voted in such manner as would preserve continuity in the management of the Maryland Hotel. The trust managers caused an appraisal of the property to be made by the appraisal committee of the Chicago Real Estate Board which showed the fair market value of the property to be $800,000. The Metropolitan Trust Company was to be retained to supervise the management of the hotel. A registration statement of the securities of the corporation and the voting trust agreement with respect to its shares was filed with the Securities and Exchange Commission. In both the original and amended registration, the statement was made that the corporation proposed to purchase the Maryland Hotel for the sum of $800,000 being the appraised value fixed by the Chicago Real Estate Board. The opinion of the commission was that the appraisal was excessive and it ordered same deleted, which was done.

On August 13, 1945, the trust managers amended the trust agreement by adding to article II thereof the following: "provided, however, that the foregoing provisions of this article II that the fair value of the real property to be sold or otherwise disposed of shall be fixed by the Appraisal Committee of the Chicago Real Estate Board, or, in case no such Committee shall be acting, by such other institution or similar valuation Committee acting in the City of Chicago and generally accepted for appraisal purposes, shall be inoperative and inapplicable if the Trustee shall sell the Trust Property or any part or parts thereof (including all or any part of the real estate) at or prior to the termination of the Trust to another Trust or to a

corporation now or hereafter organized, in exchange for all of the stock, bonds, certificates of beneficial interest or other securities of such trust or corporation." They also amended article XII by adding the following: "provided, however, and notwithstanding the foregoing provisions of this Article, if the Trustee, pursuant to the provisions of Article II, shall have sold the Trust Property (at or prior to the termination of the Trust) to another trust or to a corporation now or hereafter organized, in exchange for all of the stock, bonds, certificates of beneficial interest or other securities of such trust or corporation, then the Trustee shall have the power at any time either to distribute such securities among the Holders of Certificates of Interest issued and then outstanding of record hereunder, pro rata according to the respective number of units represented by said certificates then held by them, or to cause such securities to be distributed directly by such trust or corporation so purchasing the Trust Property to such Holders of Certificates of Interest in the manner made to each holder of a Certificate of Interest upon the surrender of his certificate and the giving by him of such evidence of identity and of such release of interest as the Trustee may, in its discretion require."

The trust managers determined and declared that in their judgment, "the foregoing amendments to the Trust Agreement aforesaid do not adversely affect the substantial rights of the Holders of Certificates of Interest."

On August 31, 1945, the trustee, on the direction of the trust managers, mailed to the certificate holders of the trust a letter advising them of the proposal to sell the trust property to the corporation in exchange for the stock and bonds aforesaid and that the proposal would be consummated unless holders of certificates of interest representing thirty-five per cent or more of the outstanding units would lodge with the trustee written objection to the proposed sale or disposition within twenty days from the date of

mailing said letter. A prospectus relating to the common stock and bonds of the corporation and the voting trust certificates for the shares of stock of that corporation was enclosed with the letter. Only seventy-nine, holders of 1308 units, a little less than thirteen per cent, voted against the plan. Thereupon the trustee proceeded to carry out the plan and on September 21, 1945, conveyed all the property of the trust estate by deed and bill of sale to the corporation, which later executed the trust deed and chattel mortgage to the Metropolitan Trust Company, trustee, to secure its issue of first mortgage income bonds in the amount of $357,590.63. The actual management of the property was retained by the Metropolitan Trust Company under contract for which it was to receive two per cent of the gross receipts for its services.

Appellants assign a number of errors, but their main contention is that prior to the termination of the liquidation trust, the trustee was under a mandatory duty to sell the trust property for cash and distribute the proceeds to the certificate holders in fulfillment of the purposes of the trust and that such duty could not be evaded by any plan which was a substitution for liquidation in the absence of unanimous consent by the certificate holders. Appellees contend that the trustee and the trust managers were authorized by the trust agreement to sell the trust property to a corporation in exchange for the securities of that corporation, prior to the termination of the trust. The trial court found that the trustee, trust managers and directors of the corporation acted in good faith and were not guilty of fraud and misrepresentation. We find nothing in the record to justify our disturbing the findings of the trial court on these charges. The issue is squarely presented as to whether at or prior to the termination of the trust agreement the trustee was under a mandatory duty to sell the trust property for cash and distribute the proceeds to the stockholders or whether in lieu of that it could follow

the plan of the trustee and trust managers and sell the property to a corporation in exchange for all of its stock and bonds and compel the objecting holders of certificates of beneficial interest to accept stock and bonds of the corporation. The answer to this question must be found in the construction to be given to the liquidation trust agreement creating Trust No. 1155.

The complaint filed September 20, 1945, contains two counts, the first of which charges a breach of trust on the part of the trustee and trust managers and prays for an injunction restraining the parties from consummating the sale to the corporation. The second count alleged that the plan and design to transfer the trust property to the corporation by the trustee and trust managers in exchange for its capital stock and income mortgage bonds and to commit the beneficiaries of said trust to acceptance of such stock and bonds had nullified the mandatory nature of the trust agreement and that by reason thereof the holders of certificates of beneficial interest had become the equitable owners of the real property of such trust as tenants in common, and it concluded with a prayer for partition. While the prayer of count I prayed for an injunction, no injunction was then obtained and the trustee the following day conveyed the real property to the corporation by deed and the personal property by bill of sale and took back from the corporation all of its stock and bonds and a mortgage to secure the bonds according to the design of the plan.

As pointed out above, the agreement provided that "this trust in any event shall terminate within ten (10) years from and after the date hereof." A similar provision to the one found here was construed by this court in the recent case of *Olson* v. *Rossetter*, 399 Ill. 231, which was consolidated with the case of *Russ* v. *Blair* because the same principles of law were involved therein, and both of which were appealed from the Appellate Court to this

court. We there said, "The primary question in each case involves a construction of parts of the trust agreement pertaining to the duration of the trust. A provision in each trust agreement provided that the trust should terminate at the end of the ten-year period following the date of the contract. In another part of the contract, the trustees were authorized to amend, alter or modify the trust agreement. Assuming to exercise a power given them under such clause, the trustees, in each case, adopted a resolution extending the duration of the trust for a period of ten years." In construing the phrase "in any event," we held in both cases that it was definitely stated that the trust should not exceed a ten-year period and that there was no provision in the trust agreement which would give the trustees the power to extend the trust.

In the case of *Yedor* v. *Chicago City Bank and Trust Co.* 376 Ill. 121, the trust agreement provided for the continuance of any sale from time to time but further provided, "but such sale shall, in all events, be held not later than August 15, 1939, and neither the Committee nor any other person shall have any power to continue or postpone said sale beyond that date." We there held that the provision was mandatory and that the property must be sold by that day and the sale could not be continued or made at a later date. In the case of *Friese* v. *Friese,* 373 Ill. 216, the trust agreement provided, "In no event, however, shall this trust continue for more than two years from and after the date of the death of Meta Friese Koch." In that case, which was brought to compel the trustee to make distribution of the corpus of the trust, the time limit having expired, the trial court ordered distribution to be made within fifteen days and upon failure to do so that the master execute a deed conveying the respective interests of the parties to them, and that the decree for partition be held in abeyance pending the consummation of the distribution. On appeal we held that the provision

of the trust agreement for the termination of the trust was mandatory, and affirmed the decree of the superior court.

The plan, however, in the present case was designed to terminate Trust No. 1155 within the ten-year period through a new corporate organization and a voting trust agreement whereby the present trustee could convey the corpus of the trust to the new corporation for all its stock, 10,216$\frac{7}{8}$ shares, at a stated value of $5 per share and income bonds aggregating $357,590.63. Appellees rely upon the provision in article II which provides: "And said Trustee shall have full power to grant options to purchase, to contract to sell and to sell the Trust Property and any parts thereof on any terms, including a sale of the Trust Property or any part or parts thereof to another Trust or to a corporation now or hereafter organized in exchange for stock, bonds, certificates of beneficial interest, or other securities of such corporation or trust."

Appellants contend that the construction of article II of the trust agreement contains a recital of permissible powers which the trustee may conceivably be called upon to exercise in unforeseen and unforeseeable circumstances during the life of the trust such as to make leases, grant options to purchase, contract to sell, mortgage, partition the property, grant easements, etc., but that the sundry powers which the trustee might exercise upon a proper occasion are always subject to the ultimate purpose, as expressed in article XII, of liquidating the trust property for cash upon termination of the trust. It is not contended by appellees that the trust may be extended beyond October 15, 1945, but they say that the sale of the property to the new corporation in exchange for all of its stock and the income bonds prior to October 15, 1945, which was accomplished during the life of the trust, was a sale within the provisions of the trust agreement and therefore the trustee and the trust managers acted within their delegated powers.

Article II enumerated a number of powers which the trustee may exercise and then added, "including a sale of the Trust Property or any part or parts thereof to another trust or to a corporation now or hereafter organized in exchange for stocks, bonds, certificates of beneficial interest, or other securities of such corportion or trust." The trustee conveyed the trust property to a corporation in exchange for all its capital stock, and all of its income bonds. The word "sale" is used in connection with the word "exchange." A "sale" is ordinarily understood to mean a transfer of the property for money. There is, however, a well-known rule of construction applied to written instruments to the effect that the court will endeavor to place itself in the position of the contracting parties, and read the instrument in the light of circumstances surrounding them at the time it was made, and will consider the objects which they then evidently had in view, so that the court may understand the language used in the sense intended by the parties using it. (*Close* v. *Browne,* 230 Ill. 228.) As pointed out above, a number of cases have been before this court involving the construction of the phrases "in any event" and "in all events," but none of those cases had in them a question concerning the sale of property in exchange for other securities.

In the case of *Yedor* v. *Chicago City Bank,* 376 Ill. 121, the plaintiff's complaint and supplemental complaint were filed more than three months after the expiration of the trust agreement. Also, the new trust was not formed until the day the old trust agreement expired. The trial court granted partition on the supplemental complaint and we affirmed that decree. The question presented on the facts in this case was not in the *Yedor case.* The question involved here in the construction of article II has never been decided by this court so far as we have been able to ascertain. The same question, however, was before the First District of the Appellate Court in *Schatz* v. *American*

*National Bank and Trust Co.* 324 Ill. App. 317. The liquidating trust agreement in that case gave the trustee power "to sell trust property * * * to another trust or to a corporation now or hereafter organized in exchange for stocks, bonds or other securities of such corporation or trust." It was held in that case that the trustee had the right, over objection of a holder of a minority number of units in the trust, to sell the trust property to the newly organized corporation "in exchange for stocks" thereof and that although the carrying out of the deal might not be a "sale" within the technical definition of that term, the word "sale" as used in the trust agreement was broader and authorized the trustee to sell and convey the trust property and take in payment thereof stock in the corporation.

Appellants make no complaint about the value of the new securities to be distributed to the holders of the certificates of interest. Their own witness Logan, who made an offer in the summer of 1945 of $550,000, testified before the master that he was willing to increase his original offer to $880,000.

We held in the case of *Olson* v. *Rossetter,* 399 Ill. 231, that, "The rules of construction which apply to the interpretation of contracts apply to the construction of trust instruments. (Volume 54, American Jurisprudence, Trusts, section 17.) The object of judicial construction of a written instrument is to ascertain the true intent of the parties and to carry it out, if it does not conflict with any rule of law or good morals or the declared public policy of the State. (*Parker-Washington Co.* v. *City of Chicago,* 267 Ill. 136.) It is not the function of a court to modify a contract or create terms new or different from those to which the parties have agreed."

It is contended by appellants that the trustee did not act in good faith in deleting the appraised value from the prospectus mailed to the beneficiaries. This was done on the order of the Securities and Exchange Commission.

The amendment to article II providing that such requirements were not necessary where the property was sold to another trust or a corporation for all of its stock, bonds and certificates of beneficial interest, was printed in full in the prospectus, as was also the amendment to article XII, which provided that the trustee shall have the power to distribute such securities among the holders of certificates of interest issued and outstanding pro rata according to the respective number of units represented by certificates then held by them.

The holders of certificates of interest had all these facts presented in the prospectus mailed to them with a letter dated August 29, 1945, and mailed August 31, by the trustee, including the notice that any holders desiring to object to the proposed sale must file their written objections within twenty days from the date of the mailing of the letter. They were advised that their failure to object would be equivalent to approval of the proposed sale, and, that if the proposed sale should not be disapproved by the holders of certificates of interest representing thirty-five per cent or more of the outstanding units, the trustee would accept the offer and consummate the sale of the trust assets in accordance with the terms thereof. Less than thirteen per cent of the certificate holders registered objection and the trustee proceeded according to the notice to carry out the terms of the sale.

Construing the trust agreement in its entirety, we cannot conceive how any of the parties thereto were misled by the language contained therein. At the time the trust agreement was drawn, a committee of five members acted solely for the protection of the bondholders of the Maryland Hotel under a deposit agreement dated January 31, 1931. The provision with reference to the sale or exchange for other securities must have been put in the agreement advisedly to safeguard the interests of the beneficiaries against the sacrifice that might result in case of

a forced sale for cash. It can be understood in no other way. The beneficiaries were given notice of their right to register objection, but only a few objected. The word "sale" used in connection with the word "exchange" was used out of its ordinary meaning to include not only a sale for cash, but to include a sale in exchange for stocks and bonds of a corporation. There was a sale of the trust property within the meaning of the provisions of the trust agreement before its expiration date.

At the time the appellant Plast filed his partition suit, neither he nor any other appellant had an equitable interest in the trust property entitling them to partition. After filing his suit and asking for an injunction to prevent the sale and transaction to which he objected, Plast sat idly by until the whole transaction was completed and then procured an injunction which was dissolved because he had been guilty of *laches*. (*Plast* v. *Metropolitan Trust Co.* 330 Ill. App. 135.) The other appellants did not file their petition to intervene until April 21, 1947, after all the transactions complained of were completed and after the master had filed his report. The evidence shows that the interests of the certificate holders were fully protected and that the trustee and the trust managers acted within the powers conferred upon them by the trust instrument.

Appellants complain of the assessment against them of damages for the wrongful suing out of the temporary injunction herein which was thereafter dissolved. Their complaint is without merit, as the assessing of damages was proper and the amount thereof was reasonable.

The order of the court assessing damages and the decree dismissing the complaint as amended and supplemented were proper and are affirmed. *Decree and order affirmed.*

Mr. JUSTICE GUNN, dissenting:

I disagree with the majority opinion. Substantially the same clause providing for termination is contained in this

case as was under consideration in *Olson* v. *Rossetter,* 399 Ill. 232. The termination clause in this case is as follows: "This trust may be terminated at such time as the Trust Managers in their sole discretion may determine; it being the intention, however, that the trust property be sold and liquidated as soon after the institution of this trust as conditions may permit and that the net proceeds thereof be distributed to the holders of certificates of interest; but if not sooner terminated, then this trust in any event shall terminate within ten (10) years from and after the date hereof."

In the *Olson case* just cited, we held that the period of the trust was not to exceed ten years and I think the same law applies to this case.

It is urged, however, that there has been a sale of the premises within the ten-year period. The evidence shows that a notice was given to the owners of 10,216 units of the trust in regard to the plan finally accepted. The opinion recites that only 1308 units were against the plan, but the record discloses that less than a majority of the units, namely, 4717, voted for the plan. The difference was represented by 4196 units not voting. It is true that in their notice the managers stated that if the owner of a unit did not vote he would be counted as voting for it, but we have been unable to find any authority which authorizes the managers of a trust or the directors of a corporation to vote the shares or units of owners in this manner. It does appear that the plan was adopted by a minority of the unit owners. Examination of the proposed plan which the managers adopted discloses that it leaves the property in the hands of the same trustee who held it before the sale was made and that no new money has gone into the plan. A new corporation was organized and each certificate holder in the trust received a share of the corporate stock in exchange, plus a revenue mortgage bond for $35. The stock had a par value of $5, and a mortgage payable solely

out of income of $357,590.63 was placed upon the property. It thus appears that the owners of the corporation are the same persons who were the owners of the trust. The money received is by a mortgage on their own property. It obligates nobody to pay the mortgage if the income is not sufficient for that purpose. It must be apparent that the whole scheme is one to continue the operation of the trust in the same trustee. No authority is offered to disclose that such a transaction constitutes a sale and certainly it does not fit into the provision of article XII that in any event the trust should be terminated and the net proceeds distributed among the holders of the certificates of interest.

It is my opinion that the decree of the superior court of Cook County should be reversed.