ALPHEUS JOHN GODDARD III *et al.*, Plaintiffs-Appellants, v. CONTI-NENTAL ILLINOIS NATIONAL BANK & TRUST COMPANY OF CHI-CAGO *et al.*, Defendants-Appellees (Gale Dillon Inglee *et al.*, Defendants).

First District (5th Division)   No. 87—2584

Opinion filed December 16, 1988.

James P. Chapman and Kathleen Hogan Morrison, both of James P. Chapman & Associates, Ltd., of Chicago, for appellants.

William F. Lloyd, James J. Carroll, Jeffrey R. Tone, and Frank B. Vanker, all of Sidley & Austin, of Chicago, for appellee Continental Illinois National Bank & Trust Company of Chicago.

Donald B. Hilliker and Michael M. Marick, both of Phelan, Pope & John, Ltd., of Chicago, for appellee W. Martin Dillon.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiffs, Alpheus Goddard III, Jane Goddard, Paul Dillon Goddard, Paul Whitman Goddard, Katherine Goddard, Sarah Goddard, and Christopher Goddard, trust beneficiaries, appeal from an order of the circuit court of Cook County dismissing their second amended complaint against defendants, Continental Illinois National Bank & Trust Company of Chicago and W. Martin Dillon, the corporate and investment trustees of three trusts,[1] which alleged that they breached their fiduciary duties in failing to sell stock comprising almost the entire corpus of the trusts in light of certain negative changes affecting the future value of the stock. The issues presented on appeal are: (1) whether the trial court erred in finding as a matter of law that the

---

[1]The other defendants are named as nominal defendants who have or may have an interest in the trusts; plaintiffs are not requesting any relief from them.

settlor of the trusts unambiguously authorized the trustees to continue to hold the stock "come what may"; (2) whether the trial court erred in dismissing plaintiff's complaint without holding an evidentiary hearing to explore the settlor's intent; and (3) whether the court erred in holding as a matter of law on a Code of Civil Procedure section 2—615 motion (Ill. Rev. Stat. 1987, ch. 110, par. 2—615) that the trustees acted in good faith so long as they continued to hold the stock, irrespective of fundamental negative changes which permanently affected the future value of the stock. For the reasons set forth below, we reverse and remand the cause for further proceedings.

Northwestern Steel & Wire Company (Northwestern) was initially formed by Paul W. Dillon (the settlor) and has been principally engaged in the production by electric furnace process of carbon steel products, such as structural shapes, bar and bar shapes, rods, wire and fabricated wire products. The company's principal place of business is in Sterling, Illinois. The subject trusts were created by the settlor in 1941, 1958, and 1973 and consist of the "Grandchildren's Trust," the "Jane Trust," and the "Great-Grandchildren's Trust," respectively. Northwestern stock represented the original corpus of the trusts. In 1973, when the last trust was created, Northwestern's annual sales exceeded $400 million.

In the mid-1970's, as alleged by plaintiffs, the steel industry began to experience profound and permanent changes in its structure, such as increased labor costs, which could be recovered only through higher prices to purchasers and could not be recouped through productivity gains, and an increasingly larger share of the United States steel market was being taken over by foreign producers in Europe, Japan and developing third-world countries. The industry also suffered increased costs as a result of increased energy costs and compliance with newly enacted governmental and environmental regulations and technological changes in certain product areas which the industry supplied. Due to increased foreign competition the industry was unable to raise its prices in sufficient amounts to recover the additional costs of production and the overall demand for steel permanently decreased because of the growing substitution of other materials, such as aluminum, plastics and ceramics, especially in the industry's traditional market of automobile manufacturing.

In the early 1980's, Northwestern experienced four years of losses, dividends were discontinued from 1982 through 1985, and, consequently, Northwestern's stock price declined. Currently, Northwestern has returned to profitability, dividends have been resumed, and its

stock price has more than doubled since plaintiffs' original complaint was filed.[2]

In November 1983, plaintiff Alpheus Goddard III, on behalf of all the plaintiffs, stressed by written and oral statements to Continental that he deemed it imperative that Continental prepare and implement a strategy to diversify the Goddard family investments out of Northwestern stock. Plaintiffs' efforts were unsuccessful and they instituted the instant action against defendants. Plaintiffs maintain that "[b]y no later than the end of 1982 or early 1983 (and most probably much earlier), it was apparent by any standard that the Northwestern stock was no longer an appropriate investment for the Trusts. This was particularly true given that the Trusts were still almost exclusively funded with many millions of dollars of Northwestern stock. Defendants' fiduciary duties independently [therefore] required them to sell the Northwestern stock in the Trusts no later than this period" and defendants' failure to do so resulted in their loss of approximately $10 million.

On May 4, 1987, following an oral statement of its findings of fact and conclusions of law, the trial court dismissed plaintiffs' first amended complaint. On July 27, 1987, the trial court granted plaintiffs leave to file their second amended complaint and, on the same day, dismissed that complaint after a hearing in which the court incorporated its May 4 findings. The court determined that the intent of the settlor was that the trustees retain the Northwestern stock indefinitely to preserve family control of Northwestern and that the trustees' actions in doing so were therefore in harmony with the settlor's intent. Accordingly, the trustees' action in deciding not to sell the

---

[2]As more particularly stated by plaintiffs, "the earnings per share of Northwestern that were $3.75 in 1981 decreased to a deficit of $1.89 per share in 1982; to a deficit of $2.55 per share in 1983; to a deficit of $4.57 in 1984; to a deficit of $5.44 in 1985; and a profit of $0.81 in 1986. Dividends per share suffered a similar experience, starting with a high of $3.80 per share in 1980, and then dropping to $1.21 in 1981; to $1.00 in 1982; to $0.30 in 1983; to nothing in the fiscal years ending in 1984, 1985 and 1986 (following Northwestern's Board chairman Martin Dillon's 1983 year-end announcement that no dividends would be declared for the foreseeable future, even if Northwestern had net earnings), and to $0.20 per share in 1987. *** While Northwestern's operating figures improved in fiscal year 1987 and the stock price reached a high of approximately $19.00 from an earlier low of $8.00, the ability of Northwestern to perform at a level that even comes close to its late 1970's status has been permanently foreclosed by the profound, negative, permanent changes in the structure of the United States steel industry. Consequently, the value of the Northwestern stock has been permanently damaged and the stock market at this time cannot support a sale at currently quoted prices of the large amounts of Northwestern stock currently held by Continental as Trustee even if Continental were to try to sell that stock."

stock could not be said to have been done other than in good faith. More specifically, the court stated:

"To even wet [sic] your appetite and entice the Appellate Court to go in and explore this thing, I would offer a definition. I would say in a fact situation like this, good faith means unswerving loyalty and fidelity to the wishes of the settlor. A loyalty and fidelity which may mean the trustee [sic] may give the trustee leave to ignore outside influences and changes and circumstances. That's what I believe good faith means when it's encompassed with trust documents such as this. *** So that if indeed the settlor's wishes carried to their fullest, carry the beneficiaries down the drain, so be it. They go down the drain because the settlor instructed its trustee to do so on his future conduct.

* * *

There is nothing in the expressed provisions of the settlor, as contained in these trusts, which permits a Court to measure the good faith of the trustee's discharging his duty by the fluctuations in the marketplace for the shares of Northwestern.

And there is no direction to the trustee to diversity [sic] the holdings of the trust or to bail out of its Northwestern stock position when the clouds of economic uncertainty appear over the nation's steel industry.

This trust settlor had given ample demonstrations of his ability to set down in clear terms what he wanted. If he wanted to impose some duties on his trustee, which would be triggered by falling stock prices, or by economic uncertainties in the steel industry, he surely would have done so. He did not do so, and no Court, to my view, has license to assume that he would have and then do it for him."

On appeal, plaintiffs first argue that the trial court's interpretation of the settlor's intent as unambiguous in directing that the trustees retain the Northwestern stock indefinitely to preserve family control of Northwestern, notwithstanding the effect on the trust beneficiaries' interests, and to exculpate the trustees from any liability was erroneous. Defendants argue that the dispositive issue before this court is not a construction of the settlor's intent, but rather whether the trial court properly considered whether the trustees acted in good faith pursuant to the language of the trusts exculpating them from any liability. Continental also specifically contends that it "administered the trusts with care and diligence, keeping in mind P.W. Dillon's intent to continue family control of Northwestern so far

as possible." Continental further states that it has never taken the position that the settlor intended to prohibit his trustees from ever selling the Northwestern stock, but rather that the settlor intended it to retain the assets "as far as possible," it in fact explored a possible sale of the stock when Goddard urged the sale, and it has since sought to sell the stock, but that its decision not to sell earlier cannot indicate bad faith.

We disagree with defendants' position. The intent of the settlor is the initial question to be addressed before determining the secondary issue of whether the trustees acted in good faith. In determining the intent of a settlor, the rules of construction which apply to the interpretation of contracts apply to the construction of trust instruments. (*Plast v. Metropolitan Trust Co.* (1948), 401 Ill. 302, 82 N.E.2d 155.) Whether a contract is ambiguous is a question of law to be determined by the court (*Lenzi v. Morkin* (1983), 116 Ill. App. 3d 1014, 452 N.E.2d 667); an ambiguous contract is one capable of being understood in more than one sense (*Mid-City Industrial Supply Co. v. Horwitz* (1985), 132 Ill. App. 3d 476, 476 N.E.2d 1271). If an ambiguity exists, then the interpretation of a document is a question of fact which cannot be resolved by a section 2—615 motion; rather, the question can only be resolved after a trial on the merits. (*UIDC Management, Inc. v. Sears Roebuck & Co.* (1986), 141 Ill. App. 3d 227, 490 N.E.2d 164.) Additionally, a complaint should not be dismissed pursuant to section 2—615, unless it clearly appears that *no* set of facts could be proved under the pleading which should entitle a plaintiff to relief. *Courtney v. Board of Education* (1972), 6 Ill. App. 3d 424, 286 N.E.2d 25.

In the instant matter, defendants, in support of their contention that the settlor intended that they retain the Northwestern stock indefinitely to preserve family control of Northwestern, rely in part on the following trust language:

> "I consider policies and Northwestern securities as proper investments of the trust property even though they may constitute a considerable portion of all of the trust property, and subject to the following provisions of this instrument the trustee is expressly authorized to retain or invest any part or all of the trust property in such investments."

The trusts also provide that the trustees "retain indefinitely any property given to the Trustee," "any investment made or retained by the trustee in good faith shall be proper although not conforming to the rules of law otherwise applied to trust instruments," and "the Trustee's exercise or non-exercise of powers and discretions in good faith

will be conclusive upon all persons."

We note, contrary to defendants' and the trial court's interpretation of the first provision cited above, that although the settlor unequivocally waived the requirement that his trustees diversify the trusts' investments, the language is unclear as to whether he intended that they hold the Northwestern stock, "come what may," in order to maintain family control of Northwestern. The provision only states that the trustee "is authorized [permitted] to retain or invest any part or all of the trust property in such investments," not that the trustee *must* retain and invest the property in Northwestern securities to preserve family control of Northwestern. The settlor could have specifically so provided, but he did not.

We further observe with respect to the other provisions cited above, and as plaintiffs argue, that throughout the trusts the settlor also stressed that the trustees act to protect the interests of the beneficiaries. For example, the settlor empowered the trustees to make investments "which in the opinion of the trustees shall be proper and for the *best interests of the several beneficiaries* hereunder," and to invest in life insurance "upon and subject to such other terms and conditions as the trustees shall deem proper and for the *best interests of the trust estate and the several beneficiaries* hereunder." The trustees were also empowered "to distribute all or any part of the several trusts" (which would include Northwestern stock) at any time during the life of the beneficiaries should significant changes in world conditions or other events occur which would "impair substantially the accomplishment of the intent and purpose of this agreement." We also note, as plaintiffs have indicated in their brief on appeal, that "the trusts under defendants' control hold only 13 percent of the outstanding Northwestern stock. Whether the trusts keep the stock or not *could not* insure control [of Northwestern] since other Dillon family members and related entities individually own approximately 46 percent of the stock and are not bound by any agreement to keep the stock in the Dillon family. Their individually owned stock is not subject to right of first refusal, nor is it subject to any other limitation which would insure that the stock remains in family hands."

It appears to us that defendants' position, that the settlor intended that the trustees retain the Northwestern stock indefinitely, or "come what may" as interpreted by the trial court, to preserve family control over Northwestern, conflicts with the settlor's additional express intent that the trustees act in the best interests of the beneficiaries. Also conflicting with defendants' position is the fact, as admitted by defendants, that at the same time they were directed to retain the

Northwestern stock indefinitely, they also were not forbidden to sell the stock. Another conflict appears from defendants' position that they were to retain the trust property "as far as possible." This phrase certainly is not the equivalent of an intent to retain the property "indefinitely." Accordingly, we cannot agree with the trial court's finding that the settlor's intent is unambiguous. In other words, we believe the trust provisions are capable of more than one meaning and an evidentiary hearing should have been held to determine the settlor's intent before addressing the issue of whether the trustees acted in good faith pursuant to his intent.

In light of the foregoing, we do not address any other issues raised by the parties, having found that a determination of them is dependent upon the initial determination of the settlor's intent.

The judgment of the circuit court is therefore reversed and the cause remanded for further proceedings.

Reversed and remanded.

LORENZ, P.J., and PINCHAM, J., concur.