(No. 30821.—

LAURA F. FINN *et al.*, Appellees, *vs.* OLGA MONK, Appellant.

*Opinion filed January 19, 1949—Rehearing denied May 11, 1949.*

168

SNYDER, CLARKE & DALZIEL, (GERALD C. SNYDER, of counsel,) both of Waukegan, for appellant.

ERNEST S. GAIL, of Highland Park, and OKEL S. FUQUA, of Waukegan, for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

Laura F. Finn and Lavinia S. Fuqua filed a complaint in equity in the circuit court of Lake County against Olga Monk to set aside a deed to property, executed by plaintiffs and their husbands to George L. Monk, husband of Olga,

and devised by him to her. The original complaint charged that the property involved was impressed with a trust created· by Monk in plaintiffs' favor, and called for an accounting, but when the court indicated that the proof did not establish an express trust plaintiffs asked leave to amend their pleadings, and then charged that the said George L. Monk obtained the quitclaim deed from them by fraud, to their damage, and upon this amended complaint the court entered a decree setting aside the deed in question, and awarding plaintiffs $2500 damages against the surviving widow, appellant, for use of the property. The appeal is taken directly to this court because a freehold is involved.

The facts involved and the theory for recovery are somewhat unusual. The mother of George L. Monk died testate, and by her will disposed of the property involved here, *viz.*, lot 8 in block 11 in the original town of Little Fort, now the city of Waukegan, as follows: *"Third,* I give, devise and bequeath the use of all my estate, be it real, personal or mixed, of whatsoever kind and wheresoever situated, to my son, George Monk, to have and to hold the same for and during the term of his natural life, with full power to use such of said estate as he shall deem necessary for his comfort and support." This was followed by language giving power to sell and convey. The fourth clause of the will, subject to the devise to George Monk, gives all of the balance of the estate, real and personal, to Laura F. Finn and Lavinia S. Fuqua.

This will was probated in 1939. At that time George L. Monk was not married, but later he was married to the appellant. He was a factory worker and so also was his wife, and each earned approximately $20 per week. In March, 1941, he became ill and was taken to a hospital, and after an operation it was determined he had a malignant cancer, which not only prevented him from working but was certain to shortly terminate his life. He never worked

after that time, and his wife, Olga, continued to work in the factory and to support the family. The cost of the operation as well as the cost of medicine and nursing gradually depleted his savings so that at the time of his death he had $2.19 remaining in the bank account, and had sold all but two shares of some United States Steel Co. stock which he owned to pay for expenses caused by his illness.

In order to enable his wife to continue work at the factory, George L. Monk procured a Mrs. Ello to nurse and take care of him during his illness, and this she continued to do for two hundred two days, with only two days off, until he died. The nature of the work was exceedingly disagreeable, and although appellees make light of the work, and claim the amount to be paid was excessive, the description of the services performed by Mrs. Ello impresses us as being such that the charges were reasonable. Monk gradually grew worse and the mounting expenses required additional funds, and he had some conversation with appellees in which he told them he could obtain a purchaser for the property, and they volunteered to make a quitclaim deed, which they executed and delivered September 18, 1941.

The fraud alleged in the complaint grows out of this conversation. It is claimed by plaintiffs that Monk represented he had a purchaser for the property at $10,000, whereupon they advised him to accept it, and stated they would make a quitclaim deed. Under the will, of course, Monk had a right to deed the property to a purchaser, regardless of what the price might be, provided it was reasonable. There is a dispute as to the value of the property at this time. Some witnesses testified it was worth from $3500 to $4000, and others that it was worth as much as $8000. The master's report was made in 1945, and the discrepancy in the testimony as to value may well be reconciled with the rapid rise in the sale price of real estate, of which we take judicial notice, between 1941 and the date of the decree entered in this case.

Appellees produced witnesses who testified that Monk had stated he had such a purchaser. But, not content with having verbal witnesses, it appears that five days after the deed had been delivered, either Mrs. Fuqua or her husband prepared a written statement, which was taken to the bedside of Monk and there signed by him, and the acknowledgment taken by Mrs. Fuqua's husband, the plaintiffs also being present. There is no testimony to the effect that Monk prepared the instrument, or that he could read the same, as the evidence shows he could not read at that time, not only because he had lost his glasses but because the disease had affected his eyesight to such an extent that he could see nothing without having his eyes treated. The only apparent purpose for procuring this document was to fortify the appellees in their idea that a trust was created, since an express trust must be in writing.

In the meantime George L. Monk had made an arrangement to sell the property to Mrs. Ello, subject to his life estate, for the sum of $3500, to be paid at the rate of $5 per day for nursing services, and in case of his death before the sum of $3500 had been earned, to pay the difference in cash. The deed was actually prepared and delivered in escrow, but afterward was returned to Mrs. Ello and destroyed, but she continued to work and did work on the basis of $5 daily until his death.

Mrs. Fuqua and her husband were lawyers, and Mrs. Finn's son was a lawyer, all of considerable experience, and all of whom had handled the business of the mother of Monk as well as his business. They prepared the will of George L. Monk in March, 1941, in which he devised all of his property to his wife. They had settled the estate of his mother, and they had handled the objections to special assessments, when certain local improvements were placed in front of the property, and had performed other legal services for him. They knew that under the will, as they had prepared it in March, 1941, Mrs. Monk would

take no interest in the property, because Monk merely had a life estate, with power of sale, but when he told them he was in need of funds with which to pay the nurse's salary and medical expenses they readily volunteered to make a quitclaim deed, although he did not ask them to do so. It was not necessary for him to have this deed, in view of his authority under his mother's will to exercise the power to convey. Within five days after the execution of the deed, at a time when the doctor said the mentality of George L. Monk was very low and his eyesight practically gone, plaintiffs presented a statement, upon which they chiefly rely for fraud, to be signed by him and the acknowledgment to which was taken by a member of the family. The theory of the appellees is that George L. Monk and his wife and the nurse conspired to have the property sold so as to leave something for Mrs. Monk to inherit, and to enable Mrs. Ello to be paid for nursing services.

Upon the amended complaint the court held that a fraud had been perpetrated upon the plaintiffs, and that the appellant, Olga Monk, was a party to the same, and not only set aside the deed but assessed $2500 damages against Mrs. Monk, who had nothing but a job in a factory, and also left nothing from which Mrs. Ello could collect her bill for nursing.

Two principal questions arise in this case: (1) Have the plaintiffs established as a matter of fact and of law that a fraud was committed; and, (2) assuming everything they have testified to to be true, has there been any fraud which caused plaintiffs any damage?

While in chancery or equity cases we give great weight to the findings of a master in chancery and the court, yet, there are several matters in this case not touched upon, which we consider of great weight in determining the equities herein. The first matter to be considered is that all of the statements of George L. Monk are testified to by interested witnesses, at a time when he cannot speak.

We have many times said that statements alleged to have been made by a man since deceased should be accepted with caution. *Laurence* v. *Laurence,* 164 Ill. 367; *Moreen* v. *Estate of Carlson,* 365 Ill. 482; *Kosakowski* v. *Bagdon,* 369 Ill. 252.

The witnesses, both sons of Mrs. Finn, are not in accord with each other or the letter of September 18 as to what Monk said. For instance, the lawyer son says that the statement was made *after* the quitclaim deed was delivered. The other testified to three different statements, without exact dates, but all made in the office of Fuqua & Fuqua, where he worked. Neither of them testified that the deed was delivered in consideration that appellees would be better taken care of than under Monk's mother's will, or that Monk would assign his insurance, or would do anything that might be suggested "to pay you for your interest after I am gone." This is placed in the statement by plaintiffs, who prepared it. The evidence discloses that these people, who were distant relatives of Monk, expected a will to be made in their favor, which is shown not only from parts of the conversation with the sons but by the anger of Mrs. Fuqua when she found out Monk had not made another will.

The appellant claims that the facts that the plaintiffs were lawyers and were advised by lawyers, that all of the testimony comes from members of their own families, and that a fiduciary or semifiduciary relation of attorney and client existed, all tend to prove appellees in the first instance wrote the will of George L. Monk, knowing that it gave his wife nothing, and that later, when they they found he intended to exercise his power of sale, devised the means disclosed of laying a foundation for establishing a trust in property when a new will in their favor was not made. On the other hand, the appellees claim there was an agreement between the nurse and Mr. and Mrs. Monk by which they would get the property into the name of Monk, and then

it would become subject to the will of George L. Monk and pass to his wife, and be subject to his debts.

We do not believe either of these contentions is very material to the issues. George L. Monk needed money badly for his comfort and support. He had a right to sell and convey without the consent of the appellees. Appellees knew Monk had this power, and after they made the quit-claim deed and he had made no change in his will, desired to protect the remainder by another will or declaration of trust from Monk. There was nothing unlawful in either event, provided such actions were not tainted with fraud. Monk had a right to contract with Mrs. Ello for a sale, and appellees had a right to persuade Monk to give them something from his estate. Appellees say Monk had a right to use only such power of sale as he deemed necessary for his comfort and support. The evidence shows he had exhausted his money; that he had sold what personal property he had, except two shares of stock, which he attempted to give to the appellees; that his wife was unable to earn sufficient to support the family; and that there was a growing bill of $5 per day for nursing services, accrued since May, 1941, while he was suffering from a malignant cancer. These facts are not disputed, except there is some claim made that the nurse's charges were excessive, which we have mentioned above. Under these facts Monk had an undoubted right to sell and convey title in fee.

The question of reasonable value is disputed. He was to receive $3500 and the use of the property for life, and probably one of the greatest considerations was a nurse who knew how and was willing to take care of him during his last illness. Plaintiffs' witnesses testified the property was much more valuable, but these are only opinions and do not take into consideration the uncertainty of the length of time Monk would live before the purchaser would receive the reimbursement for her cash outlay. It must also be remembered that Mrs. Monk testified that the representa-

tion made to Mrs. Fuqua was not that the property was for sale for $10,000, but for $3500, with the right to use it as long as Monk lived. It is true she is interested in the result of the suit, but when the entire testimony is examined it bears several earmarks of truth, which need not be supported by a written statement obtained from a dying man. The trial judge took this view of the matter, saying: "I think the first thing that needs to be inquired into is— why did the grantors make the quitclaim deed? It seems to me perfectly obvious from the facts in the case that the reason they made the deed was to enable George Monk to secure money to take care of himself, and I am satisfied that had he sold the property and used the money to take care of himself that wouldn't have been any fraud at all because it was perfectly apparent from the arrangements of the parties." It thus appears the trial judge was of the opinion a deed from Monk was required. The deed had been made and placed in escrow, but after plaintiffs executed a quitclaim deed Mrs. Ello agreed to cancel her deed, and rely upon Mrs. Monk to pay her bill for nursing from the estate. If he had the right to pass title to obtain support and comfort, we see no fraud in accepting a deed which would enable him to obtain credit, and still have a home in which to live. Under the evidence, we think there is considerable doubt as to whether the fraudulent representations claimed to have been made were in fact made.

As to the second point, assuming that such representations were made, did they damage the plaintiffs? The deed, so far as the evidence shows, was voluntarily made. In fact, it was practically offered to be made by the plaintiffs. No conditions were placed in the deed, nor was there any statement in writing delivered in return for the deed which would evidence a trust, as first claimed. The quitclaim deed given to George L. Monk gave him no better right to sell and deliver a fee-simple title than did his mother's will; so, as a matter of fact, it did not add anything what-

ever to the rights George L. Monk obtained through the will of his mother, nor take from appellees any rights if the support and comfort of Monk required it. Further than that, it made no difference to appellees where he received the most for the property, or whether he obtained a reasonable price for it. He had a right to use the property for his comfort and support. He possibly could have obtained more cash money by selling and delivering the possession of the property, but he needed a place in which to live, and the arrangement which he made with Mrs. Ello was one which gave him not only the use of the property, but the use of the funds for his support, comfort and necessities. Under a situation such as exists here it is not necessary that the highest cash price possible to be obtained, with delivery of possession, be the test of the right to exercise the power of sale under his mother's will.

The plaintiffs have not shown how they were damaged. This is an absolute essential to recovery for fraudulent representations. It is the law of Illinois as well as that of practically every State. Cases supporting this principle are: *Bartlett* v. *Blaine*, 83 Ill. 25; *Endsley* v. *Johns*, 120 Ill. 469; *Crocker* v. *Manley*, 164 Ill. 282; *Struve* v. *Tatge*, 285 Ill. 103; *Bouxsein* v. *First Nat. Bank*, 292 Ill. 500, and many others.

In *Bartlett* v. *Blaine*, 83 Ill. 25, a debtor proposed making a composition with his creditors, and induced one creditor to sign a composition whereby he accepted one half of his claim upon the representation that no person had received any other proposition than this, when in fact the debtor had given his note for $500 to another creditor to induce him to sign. Of course, under the circumstances this note was void, and was so held by the court in a separate suit. The plaintiff creditor endeavored to set aside the composition because of this fraudulent act, and in holding that there was no damage the court said: "This * * * note was adjudged void. Void things, in law, are equivalent

to *no things*. The existence of a void note was not, in substance, incompatible with the statement that 'No person had received any other thing,' etc. * * * Again, a mere *fraudulent* representative is not actionable *per se*. If a man utter slanderous words of his neighbor, the neighbor may have his action, though he be not damaged by the words spoken. If a man, upon a valuable consideration, promise to another that he will do any given thing, and fail to perform his promise, an action. lies for the breach of promise, though no damage be done. Not so in an action for fraudulent representations. In such action, the plaintiff must not only show that the representations were made, and that they were false and fraudulent, but he must also show, affirmatively, that he has been injured thereby— that he is, in some way, in a worse condition than he would have been had the words been true."

*Struve* v. *Tatge*, 285 Ill. 103, involved the question as to whether the deed was obtained by fraud, and in denying relief the court said : "The general rule is that to constitute actionable fraud it must be shown, among other things, that the person who is alleging fraud has thereby suffered an injury, and this, as well as all the other essentials of fraud, must be proved to a reasonable degree of certainty." It is a rule that has been so soundly and universally settled since *Pasley* v. *Freeman,* 3 Term Rep. 51, and also Smith's Leading Cases, vol. 2, p. 166, that it would be a mere waste of words to further discuss it.

Let us now weigh the proof. It seems clear that appellees in the first instance believed that the letter of September 18, signed September 23, by George L. Monk, constituted written evidence of a trust. It was prepared by appellees, and they together with Mrs. Finn's son, who was a lawyer, went to the home of Monk when he was alone, with neither his wife nor the nurse present, and had him acknowledge it. There is no evidence of what he said or did other than that he signed the letter prepared by them.

After the trial court had indicated that such writing did not comply with the requirements of an express trust, the complaint was amended by adding a prayer that the deed be set aside on the ground of fraud, and this written instrument signed by Monk was the principal evidence used to establish the alleged fraud.

In order to establish the first position taken by plaintiffs in this complaint it was necessary that the deed executed by them to Monk be valid; otherwise he would have nothing out of which to create a trust; while upon the later theory advanced by plaintiffs in their amended complaint the deed must necessarily be void. The theories in the original and amended complaints are inconsistent, and under the amended complaint it is necessary for the plaintiffs to establish that the letter of September 18 was the free and conscious statement of a man capable of acting in a business transaction; otherwise, it would be insufficient to establish fraud or, for that matter, a trust.

There are two reasons appearing in the evidence why the letter of September 18 may be regarded as of little value. It appears Monk was a very sick man, with but a short time to live. Two doctors who had attended him testified. Dr. Keller said that after his operation in March "he began to show a gradual weakness or deterioration due to the condition he had, in every way, physically, mentally and in the matter of his will and personality;" that he changed from a domineering strong-willed type to a docile person, weak in the matter of will, physically, mentally and emotionally, and that by September he had very severe pain, for which he was given morphine, and he would not have been surprised at his death almost anytime following September 1. Dr. Stephen Gere testified that in September he saw George Monk four or six times, and that he was run down and dying from cancer; that he was given opiates freely, consisting of morphine and morphine tablets, and that on September 23, his opinion was that George

Monk was not in a condition where he was able to exercise judgment, and did not have the capacity to transact ordinary business.

The plaintiffs used two doctors, who had never seen Monk, as expert witnesses. Based upon an assumption that the facts testified to for the plaintiffs were true, these doctors gave the opinion that Monk was able to transact ordinary business, but on cross-examination one doctor said he did not take into consideration the effect of recently administered morphine, which would render him incapable of transacting ordinary business for a matter of hours. The hypothetical man upon whom he gave an opinion only received one-half grain doses of opiates about three weeks before his death, but he did not know how often. In answer to the same question the other expert said that the hypothetical person would be in a normal mental condition at the time he signed the letter, but on cross-examination admitted that after a period of months a person suffering from cancer grows progressively worse, and needs larger and larger doses of drugs, which is usually opium, and that such drugs usually change the personality of the patient, and that in case of cancer of the bowel the brain becomes weakened because of poor nourishment and inanition as a result of anemia. This same expert would give no opinion as to the competency of a man to transact ordinar business, based upon a hypothetical state of facts, as shown in evidence for the defendant.

Under the circumstances shown in this case, we give more weight to the testimony of the doctors who attended and took care of George Monk than to the testimony of experts who give an opinion only upon a hypothetical statement of facts propounded, which omits essential elements which they admit are material on the question of mental capacity:

Mrs. Ello, the nurse, testified that in addition to Monk being sick in bed on September 23 and in constant pain,

his eyes were in such condition he could not read a newspaper, and that his wife did all of the reading for him; that all through September she gave him an opiate between 11 and 11:30, which would last for at least three hours, and gave Monk this opiate on September 23. When under its influence, his pain was alleviated and he was much more amenable to orders.

These are the facts relating to a man who is supposed to have voluntarily signed a false declaration prepared by the plaintiffs. The evidence also shows that for years the plaintiffs, or their husbands, had attended to Monk's legal affairs, as pointed out above. The evidence of Mrs. Monk indicates that before her husband was taken to the hospital she called plaintiffs to the house, and told them he was sick, and got them to reason with him to consent to going to the hospital. After Mrs. Monk was advised she would take nothing under the will written by the Fuquas, she so told her husband, and he replied "he believed in Venie." (Mrs. Fuqua.)

On the whole the evidence shows that the plaintiffs had known Monk from childhood, were distantly related, and had on numerous occasions rendered legal services for him; had been attorneys for his mother, and at his request had settled her estate, and were on such terms that he frequently desired their advice, and received it. The facts indicate that Monk always had confidence in the plaintiffs, even when he was in a state of health, and when it appears that it is very doubtful whether he could read and whether he was free from the influence of opiates, and when his doctors expected his death at any time, a grave question arises as to whether the letter of September 18 was his voluntary act, freely and intelligently made.

In seeking to set aside the deed the burden of proof was upon the plaintiffs to establish fraud by clear and convincing evidence. (*Shlensky* v. *Shlensky*, 369 Ill. 179; *Sharp* v. *Bradshaw*, 367 Ill. 526; *Carter* v. *Carter*, 283

Ill. 324.) The instrument relied upon to establish fraud is the letter signed by George Monk on September 23, with the acknowledgment taken by a member of the plaintiffs' family, and this at a time when he was ill and his death was certain shortly, the time alone being uncertain. We think under the authorities that this document should not be given any weight for two reasons: (1) The ability of Monk at that time to transact business was doubtful, and (2) the method used to procure the same is clearly within the rule of transactions between fiduciaries.

The case of *Seely* v. *Rowe,* 370 Ill. 336, correctly states the law. In that case we said: "The principles of law controlling this case are well defined. Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists in fact, where confidence is reposed on one side and domination and influence result on the other. (*Mors* v. *Peterson,* 261 Ill. 532; *Kosakowski* v. *Bagdon,* 369 id. 252; *Beach* v. *Wilton,* 244 id. 413.) The relation need not be legal, but it may be either moral, social, domestic, or merely personal. (*Mors* v. *Peterson, supra; Roby* v. *Colehour,* 135 Ill. 300.) Transactions with a fiduciary are presumptively fraudulent, and will be stricken down unless he establishes their fairness by clear and convincing proof. *Mors* v. *Peterson, supra; Kosakowski* v. *Bagdon, supra."* *Winger* v. *Chicago City Bank and Trust Co.* 394 Ill. 94.

We are clearly of the opinion that the relationship between the plaintiffs and George L. Monk was of such a character that trust and confidence was placed by the latter at all times in the plaintiffs, and especially was he subject to their domination after he became desperately ill, and under the influence of opiates and scarcely able to see. The circumstances under which the signature to the paper relied

upon by the plaintiffs, as well as the attitude of the plaintiffs towards the nurse with respect to her compensation, compels us to believe that the deed was made because the plaintiffs knew that Monk had an absolute power of sale, and that they believed he would exercise that power if it became necessary, but that they believed he would readily execute a trust if he did not recompense them in some other way. Monk was anxious to pay the nurse, and would sell the property for no other reason. When the trial court suggested that Mrs. Ello had some strong equities, plaintiff Mrs. Fuqua's husband stated he would feel no compunction in seeing that she got nothing because of her behavior. The evidence shows she was interested only in receiving compensation for a disagreeable job, and that Monk was anxious to retain a competent nurse. There was nothing illegal in this. The nursing certainly was a part of the "comfort and support" specified in his mother's will as a reason for sale of the property.

The entire case of the plaintiffs rests upon the letter. They prepared and procured it; they are endeavoring to benefit by it; they cannot set aside the deed unless they are permitted to use it, because the burden is upon the plaintiffs to establish fraud by strong and convincing evidence to avoid a deed voluntarily made. The letter was obtained by reason of a fiduciary relationship in combination with the weakened mental and physical condition of Monk.

Appellees rely largely upon the case of *Prentice* v. *Crane,* 234 Ill. 302. This would be an excellent case in point if the position of the parties was reversed, and the plaintiffs were persons in a position similar to that of appellant's husband. In fact, the *Prentice case* in reality is authority in the appellant's favor, for to avoid the effect of the letter relied upon, a negative must be proved, and we held in that case that full and conclusive proof is not required, but evidence which renders the existence of the negative prob-

able may be sufficient. *Dorsey* v. *Brigham,* 177 Ill. 250; *Vigus* v. *O'Bannon,* 118 Ill. 334.

When the entire case is reviewed, we think that consideration of the letter of September 18, acknowledged September 23, must be entirely disregarded, and when that is out of the case there does not remain clear and convincing evidence that fraud was committed, or damage sustained by the plaintiffs.

The decree of the circuit court of Lake County is reversed and the cause is remanded, with directions to dismiss the complaint.

*Reversed and remanded, with directions.*