(No. 32065.—

MARSHALL SARASIN, Appellant, *vs.* THE LIVE STOCK NATIONAL BANK OF CHICAGO, Trustee, *et al.,* Appellees.

*Opinion filed March 20, 1952—Rehearing denied May 19, 1952.*

DAVID CHAIMOVITZ, of Chicago, for appellant.

BROWNING & PARKIN, and WINSTON, STRAWN, BLACK & TOWNER, both of Chicago, (J. ROY BROWNING, GEORGE W. OTT, and PAUL I. FLEMING, of counsel,) for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

The appellant, Marshall Sarasin, filed a complaint in chancery in the superior court of Cook County on August 31, 1950, seeking the construction of a certain liquidation trust agreement. The complaint also asked that an injunction be granted enjoining the trust managers from delivering shares of stock in exchange for units of beneficial interest under the trust; that the court decree the con-

veyance of the trust *res,* if already made, to be void; that the court order a public sale of the property in question and decree the suit to be a class suit, allowing plaintiff his costs and reasonable attorney's fees to be borne by all of the trust beneficiaries ratably. A petition for an injunction was filed on September 6, 1950, but no injunction was ever issued. The answer of the Live Stock National Bank of Chicago, trustee under the trust agreement in question, was filed September 14, 1950, and George W. Kemp, C. A. East and James A. Malooly, trust managers, filed their answer on September 22, 1950. Testimony in the cause was taken on November 27, 1950, and a stipulation as to the facts was filed without prejudice to either party to introduce further proof. On January 5, 1951, the plaintiff sought and obtained leave to file a supplement to his original complaint, in which plaintiff asked for a partition of the real estate in question. On the same date, the court entered an order sustaining a motion to strike the supplement to the complaint and entered a final decree dismissing the original complaint for want of equity. The appellant, by this appeal, seeks a reversal of the order and of the decree of the superior court dismissing his complaint. Since a freehold is involved, the appeal comes directly to this court.

The final decree recites that the cause was heard upon the original complaint, the answers of the trustee and trust managers, testimony of witnesses and a stipulation of facts. No questions are raised as to any of the pleadings. The stipulation covers most of the facts and there is no real dispute in that regard.

The property involved is the Fecher Apartment Building located at 8053-61 Cottage Grove Avenue in the city of Chicago. This building was built in 1926, is three stories high and contains eight stores and twenty apartments. Originally the property was subject to a $135,000 bond issue, which had been reduced to $103,500 when the bonds

were defaulted in 1931. In the latter year the trust deed securing the bonds was foreclosed and the property was bid in and acquired by a committee representing the bondholders.

On December 2, 1935, a trust agreement was entered into, between the bondholders' committee and the Live Stock National Bank of Chicago as trustee, creating the Fecher Block Liquidation Trust for the benefit of bondholders, which was designated as Trust No. 11064. Article I of this agreement designates the purposes of the trust. It states that its objects shall be the sale and liquidation of the trust property, the distribution of the net proceeds thereof as soon as may be practicable in the opinion of the trust managers, the conservation thereof meanwhile, and, to that end, the management and control thereof and distribution of net income to the certificate holders. The preamble provides that the certificate holders shall be trust beneficiaries only, having only a beneficial interest in the net income, proceeds and avails which may come into the hands of the trustee through sales, leases, assignments or other dispositions, conversions or uses of the trust property or any part or parts thereof.

Article II of the same agreement, in defining the duties and powers of the trustee, provides, *inter alia:* "and said trustee shall have full power to grant options to purchase, to contract to sell and to sell the trust property and any part or parts thereof upon any terms, including a sale of the trust property or any part or parts thereof to another trust or to a corporation now or hereafter organized in exchange for stocks, bonds or other securities of such corporation or trust." Article II further provides that the trustee shall hold all of the trust property in trust to sell and convert the same into cash or other personal property, but provides that the trustee shall not, **prior to the termination** of the trust, make any disposition of the trust property except upon written order signed by the trust man-

agers. There is the further provision in the same article that the trustee shall not, prior to the termination of the trust, sell or otherwise dispose of the trust property unless, not less than twenty days prior to such sale or other disposition, the trustee shall mail to the certificate holders a notice in such form as shall be designated by the trust managers, specifying the property to be sold and the terms and conditions of such proposed sale or other disposition, and no such sale or other disposition shall be made if, within twenty days of the mailing of such notice, the holders of 35 per cent or more of the units outstanding, represented by certificates of interest then outstanding of record, shall lodge with the trustee written objection to such proposed sale or other disposition.

Article VI of the agreement, in making provision for the certificates of beneficial interest under the trust and prescribing their form and contents, provides that the holders thereof have no interest, legal or equitable, in any of the property covered or referred to but only an interest in the net income, proceeds and avails thereof. By the acceptance of a certificate of beneficial interest, the holder agrees to be bound by all the terms of the trust as though set forth in full in such certificate.

Article X of the agreement provides that the business of the trust is to be managed by three trust managers. Article XV gives the trust managers the power to amend the agreement from time to time by filing amendments with the trustee. If, in the judgment of both the trust managers and trustee, (which is made conclusive and binding,) any such amendment does not materially alter the rights of the certificate holders, the amendment when filed becomes binding on all persons interested, without notice. If either the trustee or trust managers feel that the rights of the certificate holders will be affected materially by the amendment, article XV provides for the same notice as article II to all certificate holders, with the provision that if 35 per

cent or more file objections in writing to such amendment it shall not become effective.

Article XVI of the trust agreement provides for the methods of its termination. The trust may be terminated at such time as the trust managers in their sole discretion may determine, or by written direction lodged with the trustee by the holder or holders of the majority of the units of beneficial interest then outstanding. It is recited that it is the intention that the property be sold and liquidated as soon after the institution of the trust as conditions may permit, and the net proceeds distributed to the certificate holders. Article XVI further provides that, if not sooner terminated, the trust shall in any event terminate within fifteen years of the date of the agreement. The fixed termination was, therefore, December 2, 1950.

Pursuant to the terms of the trust agreement, the property was conveyed to the Live Stock National Bank of Chicago as trustee in December of 1935 and the latter assumed control of the property. Certificates of beneficial interest under the trust agreement were issued to all former bondholders. The total number of units of beneficial interest in said trust outstanding on August 3, 1950, was 1118.88, each of the face value of $100 per unit. There were, as of the same date, 130 registered certificate holders. The defendants, George W. Kemp, C. A. East, and James A. Malooly, were the duly appointed and acting trust managers.

The Fecher Building Corporation was organized as an Illinois corporation on June 2, 1950, under the sponsorship of the trust managers, for the purpose of acquiring from the trustee all of the trust property in exchange for all of the stock in the corporation. The corporation then submitted to the trustee an offer to exchange all of its capital stock for the assets of the trust and to deliver to the trustee 1118.88 shares of its fully paid and nonassessable capital stock, having no par value, being all of the authorized and

issuable stock of the corporation, for all of the assets of the trust.

At the same time, the trust managers prepared a plan to transfer the trust property to the building corporation in exchange for all of the stock of the corporation, to be submitted to the certificate holders by the trustee. It was also proposed to amend article XVI of the trust agreement by authorizing the trustee to distribute the stock *pro rata* among the certificate holders. The trust managers, by direction in writing as required, requested the trustee to submit the proposed plan and proposed amendment to the certificate holders, certifying that in their opinion the amendment materially affected the interests of the certificate holders.

On August 3, 1950, the trustee, by letter of that date, submitted the plan and proposed amendment to the 130 registered certificate holders. It is stipulated that the plan and proposed amendment were submitted to all certificate holders. The trustee mailed with its letter a copy of the plan, a copy of the proposed amendment to the trust agreement, a statement of the assets and liabilities of the trust as of January 9, 1950, a summary of the earnings of the trust for each of the fiscal years 1936 to 1949, both inclusive, a statement of the income and expenses of the trust for the same years, a statement of cash disbursements per unit for the holders of certificates of interest for each of the above years, a pro forma balance sheet of the Fecher Building Corporation, giving effect to the proposed exchange, and a statement of estimated fees and expenses in connection with the execution of the plan. A self-addressed, stamped post card was mailed to each certificate holder, which could be used by him in advising the trustee of his consent or dissent to the plan and the amendment. In the letter each certificate holder was advised that if he desired to dissent he must file his written objection with the trustee within twenty days, and that failure to object

was the equivalent of approval; that unless 35 per cent or more of the units outstanding lodged with the trustee written objections, the trustee would carry out the plan.

On August 16, 1950, the plaintiff, Marshall Sarasin, who had not owned any of the certificates previously, purchased a certificate for one unit of interest under the trust and on August 23, 1950, he delivered his letter to the trustee objecting to the proposed transfer and amendment, and threatening suit in event the plan was carried out.

By August 23, 1950, (which was twenty days after the mailing of the notice) the trustee had received post cards from thirty-seven holders of certificates representing 561.88 units of the trust, approving the proposed plan. It had received objections from three certificate holders representing 16 units of the trust and the holders of seventy certificates representing 541 units of beneficial interest had not replied.

On August 24, 1950, the trustee executed its deeds of conveyance of the trust real estate to the Fecher Building Corporation and the deeds were recorded on the same date. The trustee also delivered to the building corporation on August 24, 1950, all other assets of the trust, and the corporation delivered to the trustee 1118.88 shares of its capital stock, being all the authorized and issuable stock of the corporation. The trustee then notified the certificate holders that their stock certificates were ready and would be delivered in exchange for the certificates of beneficial interest. At the time of the trial the trustee had delivered 691.88 shares of the stock and was holding 427 shares against surrender of the certificates.

The only witnesses to testify at the hearing were the trust managers, James A. Malooly and George W. Kemp, both of whom were called by the plaintiff. Both of these men are engaged in the real-estate business in the city of Chicago. It appeared from their testimony that an offer to purchase the property for $105,000 had been received

in 1946; that they had not submitted this offer formally to all the certificate holders because they had communicated it informally to the holders of more than 500 units of interest and had been advised that it was not acceptable. It appears that this was the only offer of any consequence ever received. Malooly testified that as of August 3, 1950, the property was reasonably worth $137,500. Kemp testified that he had made efforts to get offers for the purchase of this property through his sales organization. He stated that he had submitted the property to different people and that he had encouraged clients of his to make offers from $125,000 up, but there is no evidence of any offer other than the one for $105,000.

Appellant contends that the plan proposed by the trust managers and trustee violated the spirit and letter of the trust agreement. He contends that the transfer of the trust property to the corporation is void and of no effect and that the certificate holders are entitled either to partition on the theory that title actually vested in them, or, in the alternative, to a public sale of the property under the direction of the court. He also charges the trust managers with fraud and over-reaching in the handling of the trust. Appellees contend that the plan pursued by the trust authorities was strictly in accordance with the trust agreement; that it was in the best interests of the beneficiaries and that, in the absence of any showing of fraud or over-reaching, the action of the trustee and trust managers should have the approval of the court.

The facts of the case now before us are so nearly like those involved in *Plast* v. *Metropolitan Trust Co.* 401 Ill. 302, that we have searched in vain for any material differences. That case also involved a transfer of the assets of a liquidation trust to a corporation organized for the express purpose of exchanging its stock and bonds for those assets prior to the termination date of the trust. The same arguments which have been urged here against

the action of the trust authorities were urged in that case, but we there concluded that the transfer and exchange were proper and lawful.

The pertinent provisions of the trust instrument before us here are identical with those in the instrument in question in the *Plast case* which provided (in article II) : "And said Trustee shall have full power to grant options to purchase, to contract to sell and to sell the Trust Property and any parts thereof on any terms, including a sale of the Trust Property or any part or parts thereof to another Trust or to a corporation now or hereafter organized in exchange for stocks, bonds, Certificates of Beneficial Interest, or other securities of such corporation or Trust;". Nor are there any substantial differences between the trust agreements involved in the two cases as to the expressed purposes of the trusts, the rights and interest of the certificate holders, the powers and duties of the trust managers, the right to amend, and methods of termination. Both agreements contain the same provision for notifying the certificate holders of a proposed sale or other disposition of assets prior to the termination of the trust and provide that if 35 per cent or more of the units outstanding shall lodge written objections with the trustee, the sale or other disposition shall not be made.

It is contended here, as in the *Plast case,* that it was the duty of the trustee, prior to the termination of the trust, to sell the trust property for cash and distribute the proceeds among the certificate holders. In dealing with the same argument in the *Plast case,* we say, at page 315.: "The word 'sale' used in connection with the word 'exchange' was used out of its ordinary meaning to include not only a sale for cash, but to include a sale in exchange for stocks and bonds of a corporation. There was a sale of the trust property within the meaning of the provisions of the trust agreement before its expiration date." It should also be observed that in addition to the language in article II

expressly providing for a sale of the trust assets in exchange for the stocks of a corporation there is the language also found in article II which refers to a sale or other disposition of the trust property; for example, it is provided in article II that the trustee shall not sell or otherwise dispose of the trust assets prior to the termination of the trust, without notice to the certificate holders. The words "otherwise dispose of" clearly contemplate that the trustee may lawfully propose a disposition of the trust assets otherwise than at a sale for cash. We believe that the trust agreement involved here, the plan of transfer and the manner of its execution are identical with the agreement, plan and method of execution found in the *Plast case.* In the case now before us, just as in the *Plast case,* notices were sent to all certificate holders, containing a full statement of the plan and notifying them that any desiring to object must file written objections within twenty days. They were also advised that a failure to object would be equivalent to approval of the proposed plan and that if the proposed plan should not be disapproved by the holders of certificates of interest representing 35 per cent or more of the outstanding units, the trustee would accept the offer and carry out the plan. In the *Plast case* less than 13 per cent of the certificate holders registered objections. In the case now before us the percentage of objections was less than 1½ per cent. We approved the method of procedure in the *Plast case* and we approve the same procedure here, because we find it strictly in accordance with the provisions of the trust agreement. That agreement actually provides that the holders of certificates representing a minority interest may block the proposal but it clearly provides that that minority must represent 35 per cent or more of the certificates outstanding. It is argued here, as in the *Plast case,* that the whole plan was a deviation from the true purposes of the trust and that, therefore, the consent of all of the certificate holders was required. We find that the

plan, for reasons already stated, was not a deviation from the trust but is in strict accord with the provisions of the trust instrument. The trustee was justified in proceeding with the plan in the absence of the number of objections specified in the trust instrument.

Appellant contends that the amendment to the trust instrument proposed and adopted had the effect of extending the trust beyond its termination date and accomplished indirectly what would not have been sanctioned by direct action. In the *Plast case,* we held that the plan did not amount to an illegal attempt to extend the trust beyond its termination date but was a plan whereby the trust was properly terminated within the period provided for its existence. The amendment to the article here in question, like the amendment in the *Plast case,* merely provides the means whereby the stock may be distributed when the trust assets are disposed of as provided in article II. It does not have the effect of illegally extending the termination date of the trust. Indeed, there may be considerable question that any amendment was needed in view of the plain provisions of article II, which state: "And shall hold all of the Trust Property in trust, to sell and convert the same into cash or other personal property, and to distribute the net proceeds thereof to the beneficiaries hereunder." It appears to us that this provision would have authorized distribution of the stock received by the trustee among the beneficiaries without amendment of the articles of trust.

Appellant seeks to distinguish the case at bar from the *Plast case* on the ground that in the *Plast case* the apparent value of the property at the time of the proceedings was less than the amount of the bonds in default, whereas in the case now before us the apparent value of the property was greater than the amount of bonds in default. It is suggested that in the former case this court must have had in mind that, because the value of the property was less than the original indebtedness, the purpose of the trust had

not been achieved and for that special reason the court was willing to approve the plan of transfer. A careful reading of the opinion in the *Plast case* shows that it is not subject to the limitation that counsel for appellant would place upon it. The opinion in that case is based upon a construction of the trust agreement. It holds that under that agreement the plan there evolved and consummated was lawful. There is no suggestion in the opinion that any consideration was given to the amount of the original bond issue. We fail to see the importance of any such consideration here. The provisions of the trust agreement now before us do not limit the powers of the trustee by any consideration of the amount of the original indebtedness. We cannot change the agreement of the parties by reading into it limitations that do not exist. It neither expressly nor impliedly provides that the trustee shall have the power to transfer the trust assets to a corporation as provided in article II only if the then apparent value of those assets is less than the amount of the original bonded indebtedness.

Appellant contends that the court erred in striking the supplement to his complaint which prayed for a partition of the real estate. The whole argument that the plaintiff is entitled to partition presupposes that the trustee failed to dispose of the trust property in a manner authorized by the trust agreement within the period of time prescribed for the duration of the trust. Appellant advances his contention in the following language on page 43 of his argument: "If the trust has terminated and if the trustee fails to dispose of the property in the manner authorized by the trust agreement, title to the trust property will vest in the beneficiaries and thereupon the beneficiaries are entitled to partition." Since we hold that the disposition made by the trustee was lawful and since it was made within the fifteen-year period provided for the duration of the trust, it follows that appellant, under his own theory, would have no right to partition.

Appellant has charged in his complaint that the trust managers were acting in bad faith and for a personal profit; that they had made no efforts during the life of the trust to sell the property even though there were available markets; that their plan was a scheme to depress the market price of the trust units so that they could purchase more units for themselves. The proof falls far short of sustaining any of these charges. We find no evidence of any fraud or bad faith on the part of the trustee or the trust managers.

The order of the superior court of Cook County striking the supplement to the complaint, and its decree dismissing the original complaint for want of equity, are correct and they are affirmed.

*Decree and order affirmed.*