(No. 33182.—

WILLIAM M. WALLACE *et al.*, Appellees, *vs.* JAMES A. MALOOLY *et al.*, Appellants.

*Opinion filed Sept. 23, 1954—Rehearing denied November 15, 1954.*

Browning & Parkin, of Chicago, (J. Roy Browning, and Warren W. Browning, of counsel,) for appellants.

Seyfarth & Atwood, and Victor Neumark, both of Chicago, (Benton Atwood, of counsel,) for appellees.

Mr. Justice Hershey delivered the opinion of the court:

This is an appeal from a decree of the superior court of Cook County invalidating a transfer of trust property to a corporation, ordering that said transfer be set aside and the property reconveyed to the trustee, who was directed to sell the same and distribute the net proceeds among the persons entitled thereto, and ordering two of the trust managers to return $1000 paid them. A freehold being involved, the appeal comes directly to this court.

On July 5, 1951, a complaint in chancery was filed by William M. Wallace and Daniel Anderson, the owners of 25 and 10 units respectively of a total of 1350 units of beneficial interests in the Astrid Building Liquidation Trust, against the Livestock National Bank of Chicago, as trustee, James A. Malooly, George W. Kemp, Jr., John L. Maehler, as trust managers, and the 7906 Carpenter Building Corporation, to enjoin the conveyance of certain trust property consisting of a three-story brick store and apartment building located at Seventy-ninth and Carpenter streets, in Chicago, Illinois. The complaint was amended on September 10, 1951, and prayed that the conveyance of the trust property by the trustee to 7906 Carpenter Build-

ing Corporation be set aside, that the trust property be sold at public auction under the direction of the court, that the trust managers return fees they had received, and that 7906 Carpenter Building Corporation, the trustee, and the trust managers make an accounting with respect to the trust property. After the case was at issue and during the trial, John Krafcisin, the owner of five units of beneficial interest in the trust and who had transferred his units for stock in the building corporation, was allowed to intervene, praying the same relief as the original plaintiffs.

A bondholders committee foreclosed a mortgage for $135,000 on the property in question and acquired the property upon such foreclosure for the benefit of the bondholders. On January 14, 1937, a trust agreement was entered into between the bondholders' committee and the Livestock National Bank of Chicago, as trustee, creating the Astrid Building Liquidation Trust No. 11304 for the benefit of the bondholders. This trust agreement provided for the liquidation of the trust assets and the distribution of the net proceeds among the beneficiaries. It was declared in the trust instrument that the interest of the holders of trust certificates of beneficial interest in the trust was personal property and that no holder at any time should have any claim, title or interest, legal or equitable, in or to any of the trust property but only an interest in the net income availed from the proceeds thereof. It provided for three trust managers, who were authorized to direct the affairs of the trust in all things. The defendants, Malooly, Kemp and Maehler were the trust managers. Certificates of beneficial interest, having a face value of $100 each, were delivered to the bondholders in proportion to the value of the bond held by each bondholder. On acceptance of the certificate the holder agreed to accept and be bound by all the terms, conditions and provisions contained in the trust agreement. The trust was to be terminated at such time as the trust managers in their discretion might determine,

or by the written direction lodged with the trustee of the holder or holders of the majority of the units of beneficial interest then outstanding. It was provided, however, that the trust property was to be sold and liquidated as soon after the institution of the trust as conditions might permit and the net proceeds distributed to the certificate holders. If not sooner teminated, the trust in any event was to terminate within 15 years from and after the date of its institution. The trustee was given full power to sell the trust property or a part thereof provided, however, that the trustee should not sell or dispose of the trust property prior to the termination of the trust, unless, not less than 20 days prior to such sale or other disposition, the trustee mail to the certificate holders a notice briefly specifying the property to be sold or disposed of and the terms and conditions of such sale or disposition. It was further provided that no sale or other disposition should be made if within 20 days from the date of mailing such notice the holders of 35 per cent or more of the outstanding units should lodge written objections to the sale or disposition with the trustee.

The trustee had not received any offers to purchase the property at its fair value, under the terms of the agreement, prior to June 15, 1951. The termination date of the trust was January 14, 1952, and then the trustee would be compelled to sell the trust property at private or public sale for the best price available. Consequently, the trust managers proposed a plan to preserve the property for the benefit of the certificate holders until such time as an advantageous cash sale could be made, or if no such sale was made, to preserve the property as a continuing income-producing investment for the certificate holders. It was proposed that the trustee exchange the trust property for stock in a corporation within the period of the trust.

The 7906 Carpenter Building Corporation was organized by the trust managers in June of 1951 for the purpose

of acquiring the trust property in exchange for all of the stock of the corporation. On June 15, 1951, the trustee sent a letter to all of the certificate holders enclosing a copy of the plan and a proposed amendment to the trust agreement providing that the stock in the corporation received by the trustee as a result of the exchange might be distributed by the trustee *pro rata* to and among the holders of the certificates of interest rather than be retained by the trustee and be subject to the provisions requiring liquidation of the remaining trust property at the time of termination. Also incorporated in the letter was a statement of the assets and liabilities of the trust, a summary of the earnings of the trust for each of the fiscal years 1937 to 1950, inclusive, a statement of income and expenses of the trust for the same years, cash disbursements per unit by the trustee to the certificate holders for each year, a statement of fees and estimated expenses in connection with the proposed exchange, and an appraisal by John P. Coffey, described as "an agent of McKey & Poague, Inc.," appraising the market value of the property at $167,500 as of May 1, 1951. The trustee further informed the certificate holders that it would be necessary to sell the property at private or public sale for the best price obtainable if the property was not disposed of prior to January 14, 1952. It was also stated that "a number of certificate holders and the trust managers deem it to be best interests of the certificate holders to adopt the plan herein outlined so that the trust property will be preserved for the benefit of the certificate holders until such time as a more advantageous cash sale can be negotiated and if such a sale cannot be negotiated, to preserve the trust property as a continuing income producing investment for the certificate holders, and the foregoing plan is designed for that purpose only." A self-addressed and stamped postcard was enclosed with the letter upon which any certificate holder might evidence either his consent to the plan or his objection thereto.

The certificate holders were informed that any written objections or dissents had to be filed within twenty days from the date of the letter. The certificate holders were also informed that if objections were not received from holders of 35 per cent or more or the units of interest within twenty days the trustees would accept such offer and consummate the sale of the trust assets in accordance with the terms of the plan.

After receiving the trustee's letter of June 15, 1951, the plaintiff Wallace on June 20, 1951, made both written and oral demands on the trustee and the majority trust managers, Kemp and Malooly, for access to the list of names and addresses of all of the holders of certificates of beneficial interest in the trust. Wallace advised the trustee and the trust managers that he had available a prospective purchaser who was ready, willing and able to pay $145,000 cash for the property and that such offer would pay out to the certificate holders substantially one hundred cents on the dollar, which was in contrast to the sixty cents on the dollar for which the securities were then selling. He informed them that due to the twenty-day period for objections he did not have time to submit a formal offer from the purchaser, as it would then be too late for the certificate holders to reject the proposed plan. He stated that he desired access to the list of certificate holders for the purpose of informing them that he had available this prospective purchaser and to solicit their vote in objection to the plan submitted by the trust managers. He stated he also wished to inform the certificate holders that as a result of his investigation he had found the plan to be inimical to the best interests of the certificate holders other than the group consisting of the trust managers and their associates, that the trust managers and their attorneys desired to perpetuate themselves in control of the trust property for the purpose of continuing to receive the special benefit derived from the control and management of the

trust property, including continued purchase of interests at prices less than fair liquidation value which could be realized by cash sale, and that the appraisal of $167,500 was excessive and made by an appraiser who was actually a member of Kemp's firm. Wallace was denied access to the list of certificate holders and consequently he was unable to present his objections and observations to the other certificate holders.

By July 6, 1951, the holders of less than 35 per cent of the beneficial interests had disapproved of the plan. On that date, which was exactly twenty days after the mailing of the plan to the certificate holders,, the trustee executed its deeds of conveyance of the trust real estate to 7906 Carpenter Building Corporation and delivered all the other assets of the trust to the corporation, in exchange for which the corporation delivered to the trustee 1350 shares of its capital stock, being all the stock authorized and issuable by the corporation. At 10 A.M. on the same day there was a board of directors meeting of the corporation, at which the attorneys for Kemp and Malooly, acting as sole directors, passed resolutions appointing the firm of McKey & Poague, Inc., as managing agent for the property at five per cent of the gross receipts, assuming unpaid debts of the trust which included new fees of $2000 for Kemp and Malooly and $2000 for their attorneys, providing a fee of $150 a year for each of said director attorneys, and making the trustee depositary of corporate funds.

On July 5, 1951, the day before the sale to the corporation was made, Wallace and Anderson filed their original complaint seeking to enjoin the transfer of the property, and if the proposed transfer had been consummated before the issuance of an injunction, to declare the building corporation a constructive trustee of the trust assets so transferred and order a production of a list of the certificate holders, or, in the alternative, that the trustee and the trust managers be ordered to sell the trust assets

upon the expiration of the trust on January 14, 1952, under supervision of the court. After the complaint had been amended and answers and replies filed, the cause was referred to a master. Subsequently the court vacated the reference to the master and proceeded to hear and rule upon the cause.

The trial court found that Kemp and Malooly devised the plan to prevent liquidation of the trust and to perpetuate their control of the property and the receipt of benefits therefrom; that Wallace's object in demanding the list of beneficiaries was proper, and the trust managers violated their fiduciary duties in arbitrarily refusing the same; that they violated their fiduciary obligations in obtaining and publicizing the $167,500 appraisal which was excessive by more than $20,000; that they improperly advocated acceptance of the plan; and that they were motivated by their personal interests in advancing the plan and concealed and misrepresented the true facts, relationships and adverse interests.

The court decreed that the transfer of the trust property to the 7906 Carpenter Building Corporation be set aside and the property reconveyed to the trustee, who was directed to sell the same and distribute the proceeds among the persons entitled thereto, and that Kemp and Malooly return $1000 paid them under the resolution of the corporation as reorganization managers' fees.

In accordance with the terms of the trust agreement, the trust managers controlled the actions of the trustee in the management of the trust property. Together with the trustee, the trust managers therefore occupied a fiduciary relationship to the certificate holders, the trust beneficiaries. Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists

in fact, where confidence is reposed on one side and domination and influence result on the other. (*Finn* v. *Monk,* 403 Ill. 167.) Thus occupying positions of trust, the trustee and the trust managers were obligated to act with the highest degree of fidelity and with utmost good faith toward the beneficiaries. *White* v. *Macqueen,* 360 Ill. 236.

The trial court found that two trust managers, Kemp and Malooly, were so guilty of breaches of trust as to justify setting aside the conveyance of the trust property to the corporation.

First, the trial court found that said trust managers violated their fiduciary duties to plaintiff Wallace by denying him access to the list of certificate holders. The plaintiffs contend that Wallace's purpose in demanding access to the list was proper and that the trust managers had a duty to comply with his request.

It is insisted by the defendants that under the terms of the trust agreement Wallace, as a trust beneficiary, was not entitled to said list. They point to that part of the trust agreement which provides that the certificate holder shall have only a beneficial interest in the net income, proceeds and avails which shall come into the hands of the trustee and the trust managers and shall claim no interest in the property covered by or referred to in said trust. However, Wallace did not attempt to assert a legal or equitable interest in the list of certificate holders, but merely asked to see the list for the purpose of contacting those holders. Nothing in the trust agreement denies the certificate holders the right to legitimately see that the trust is properly managed or to oppose the trustee's policies in the interest of promoting the well being of the trust and its beneficiaries. Providing his purpose is proper, the beneficiary has a right of inspection on demand to see that the trust is properly executed. *Wylie* v. *Bushnell,* 277 Ill. 484 ; *Baydrop* v. *Second National Bank,* 120 Conn. 322; 4 Bogert, Trusts and Trustees, par. 961.

Restatement of the Law of Trusts, section 173, provides: "The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust." In commenting upon this section the authors of the Restatement have stated: "Although the terms of the trust may regulate the amount of information which the trustee must give and the frequency with which it must be given, the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust."

The holders of certificates of beneficial interest under a trust agreement have the same right to examine the records of the trustee as do shareholders in a corporation; likewise, a certificate holder has a right to demand a list of certificate holders for a proper purpose the same as a shareholder may demand a list of shareholders. *Olson* v. *Rossetter*, 399 Ill. 232, 242, (affirming 330 Ill. App. 304, 319-20); *Morris* v. *Broadview, Inc.*, 338 Ill. App. 99, 105-6, (reversed on the issue of proper purpose in 385 Ill. 228, 235); *Baydrop* v. *Second National Bank*, 120 Conn. 322.

Here it is clear that Wallace did not seek access to the list merely to gratify his curiosity or for a speculative or vexatious purpose, but sought to communicate with the beneficiaries regarding what he believed to be a better arrangement for liquidating the trust and to advise them of what he believed to be misconduct on the part of the trust managers. His purpose being proper, Wallace was entitled to the list.

The evidence discloses that Kemp and Malooly controlled the corporation to which the property was trans-

ferred. Since they occupied positions of trust, it was a violation of their trust for the trustee and the trust managers to permit the list of certificate holders to be used by Kemp and Malooly to in effect solicit the sale of the trust property to the 7906 Carpenter Building Corp., while at the same time denying the list to certificate holder Wallace.

It must be borne in mind that the object of the trust, as stated in article I of the trust agreement, was "the sale and liquidation of the trust property and of all such other property incidental thereto as may hereafter be acquired from time to time under this trust, and the distribution of the net proceeds thereof as soon as may be practicable in the opinion of the trust managers." While this court has held in cases involving similar trust agreements that under certain circumstances the trustee or trust managers may before the termination of the trust sell the trust property for corporate securities and amend the trust agreement to distribute the securities *pro rata* among the beneficiaries, still, in appraising the action of the trust managers in effecting such a sale it is proper to consider their conduct in the context of the primary duties imposed upon them by the trust agreement.

The trial court found many actions of the trust managers to be violative of their fiduciary obligations. We mention a few which we believe are supported by the evidence and which, under the circumstances of this case, are of such a nature as to require our affirming the invalidation of the conveyance. As we have already pointed out, the trust managers refused plaintiff Wallace access to the list of certificate holders in order that he might communicate with other beneficiaries in an effort to block the transfer, while at the same time the trust managers made use of said list to explain and recommend the plan which they devised. We believe the plaintiff was entitled to this list, and under the evidence do not believe the trust managers

were acting in good faith in denying him access thereto. He told them he had a prospective purchaser who would pay $145,000 for the property, which would net the beneficiaries nearly $100 per unit, as compared with the prevailing market price of $60. It was nowhere contended that $145,000 was not a fair price for the property. While it is true that Wallace did not have a formal offer from this purchaser, the evidence does show that a contact had been made with the prospective purchaser by Wallace's attorney, who believed that the transaction could be carried out and who communicated this to the two trust managers. They did not exhibit any interest in this possibility, merely stating that a formal offer should be made. Yet the plaintiff's attorney advised them there would be insufficient time to submit a formal offer from the purchaser, because the twenty-day period for objections would continue to run and after such delivery it would be too late to urge the certificate holders to reject the proposed plan. In this the attorney's apprehensions appear to have been justified, inasmuch as the sale of the property to the corporation was carried out with great dispatch, the sale being consummated at the earliest possible time, July 6, 1951. Indeed, on that very day the trust managers, who organized and controlled the corporation, caused said corporation, by resolution, to give McKey and Poague, Inc., of which Kemp was vice-president, treasurer, and a shareholder, the management of the corporate real estate at a fee of five percent of rentals. This action was taken at a time when attorneys for Kemp and Malooly were sole directors and before the beneficiaries were notified to exchange their units for stock. At the same time the corporation assumed unpaid debts of the trust which included new fees of $2000 for Kemp and Malooly and $2000 for the attorneys, employed said attorneys at a fee of $400 annually, provided a fee of $150 per annum for each of said director-attorneys, and made the trustee depositary of corporate funds. The conclusion

is inescapable, from a consideration of this record, that the trust managers had agreed upon this course of conduct which would preserve the property as an investment for the certificate holders and result in their own financial enhancement by reason thereof, and only a dissenting vote by the holders of thirty-five per cent of the beneficial interests in the trust could prevent their carrying out of the plan. This unquestionably accounts for their arbitrary refusal to allow Wallace access to a list of the beneficial owners and for their failure to pursue the possibility of sale proposed by him.

There were other alleged acts and omissions considered by the trial court to be breaches of trust on the part of the trust managers, but we do not deem it necessary to discuss these in detail, sufficient matters having already been stated which disclose that the trust managers did not properly fulfill their duties as fiduciaries and that the conveyance was made under circumstances involving serious breaches of trust on their part.

It is a well settled principle in equity that where a trustee commits a breach of trust and becomes liable to his *cestui que trust,* the latter has the option of following the property into the hands of the purchaser if he takes it with notice, or to recover the amount he has been injured. (*Piff* v. *Berresheim,* 405 Ill. 617, *Lennartz* v. *Estate of Popp,* 118 Ill. App. 31.) We have here determined that the trust managers stood in a position of trust. The denial of the list of beneficiaries by the trust managers and other acts showing a lack of good faith on the part of the trust managers constituted breaches of trust which were materially connected with the conveyance of the property to the corporation. In addition, the defendant corporation was not a *bona fide* purchaser. The defendant trust managers organized the corporation, and the shareholders of the corporation are the same persons who are certificate holders of the trust. The management of the corporation

resided in the defendant trust managers, and the purchase by the corporation was not without notice of the breaches of trust. Consequently, these plaintiffs had the right to pursue the property in equity and demand a reconveyance.

It is urged by defendant that the plan followed for the sale of the trust property and distribution to the certificate holders has been heretofore approved by this court under a trust agreement, plan and amendment identical in all respects to that here involved. In making such assertion they rely upon the cases of *Plast* v. *Metropolitan Trust Co.* 401 Ill. 302, and *Sarasin* v. *Livestock Nat. Bank,* 412 Ill. 88, and insist that those cases establish rules of property upon which they are entitled to rely as the law of this State. It is true that the *Plast* and *Sarasin cases* involve similar trust agreements, plans of sale and amendments of trust. However, they differ from the case at hand in that in those cases there was no demand for the list of beneficiaries prior to the sale which was refused, nor was there a separate and more beneficial possibility of sale. Moreover, in neither case was there evidence of wrongdoing by the trust managers such as that disclosed by this record.

It is finally contended by defendants that the trial court erred in permitting John Krafcisin to intervene and be made a party. However, the court decreed that the conveyance to the corporation be set aside. The same result would obtain whether Krafcisin was a party or not. Certainly his intervention did not prejudice the rights of the defendants in any way.

The conveyance to the corporation was properly set aside by reason of the breaches of trust on the part of the trust managers, Kemp and Malooly; accordingly, the decree of the superior court of Cook County is affirmed.

*Decree affirmed.*